

**FILED**

Sep 29 2017, 8:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Donald J. Frew
Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of E.K. (Minor Child), A Child in Need of Services, | September 29, 2017 |
| and, | Court of Appeals Case No. 02A04-1703-JC-684 |
| J.M. (Mother), and T.K. (Father), | Appeal from the Allen Superior Court |
| Appellants-Respondents, | The Honorable Charles F. Pratt, Judge |
| v. | The Honorable Sherry A. Hartzler, Magistrate |
| The Indiana Department of Child Services, | Trial Court Cause No. 02D08-1610-JC-506 |
| *Appellee-Petitioner.* | |

**Barnes, Judge.**

# Case Summary

T.K. ("Father") and J.K. ("Mother") appeal the finding that their child, E.K., is a child in need of services ("CHINS"). We reverse.

# Issue

The issue before us is whether there is sufficient evidence to sustain the trial court's CHINS finding.

# Facts

In October 2016, E.K. was three years old and still in diapers. On October 14, 2016, a daycare provider noticed bruising on E.K.'s buttocks when changing his diaper and noticed that he was in discomfort when sitting down. The daycare facility contacted the Allen County Office of the Department of Child Services ("DCS") to report the bruising. Case manager Keshona Fomby began investigating the matter and photographed E.K.'s buttocks. E.K. had been attending the daycare for approximately two years, and it had never previously made any reports concerning E.K. to DCS, nor did it have any records of anyone noticing similar bruising to E.K. before.

Father admitted to Fomby that he had spanked E.K. on the evening of October 13, 2016. According to Father and Mother, E.K. frequently had temper tantrums at bedtime and refused to go to sleep. On this evening, Father and Mother attempted to put E.K. to bed at 9 p.m., but E.K. refused to calm down. Father and Mother normally left E.K.'s door open at bedtime, but would close it if he continued getting out of bed, and his door was closed on this evening.

E.K. was kicking his door, tearing his window blinds, throwing himself on his bed, and throwing toys around his room. Father attempted to talk to E.K. to calm him down, progressed to removing toys from E.K.'s room, and then to removing E.K.'s television. At about 10:45 p.m., Father spanked E.K. once through his diaper. When E.K. still did not calm down, Father spanked E.K. again through his diaper. Finally, Father spanked E.K. a third time on his bare bottom, and E.K. went to sleep shortly thereafter. Each spanking consisted of a single swat.[1] Mother was aware of the spanking but did not witness it. Father said he had used spanking as discipline for E.K. on about three occasions. On this occasion, Father believed a spanking posed less threat of harm to E.K. than his continued tantrum.

[5] On October 17, 2016, Father and Mother met with Fomby and signed a "safety plan" that prohibited the parents from using physical discipline with E.K. Tr. Factfinding Hr'g p. 48. E.K. was not removed from his parents' care. Afterwards, the parents and E.K. regularly participated in a home-based family counseling program, which the parents believed was helping them better parent E.K. and address his tantrums and in which they planned on continuing to participate. There was one incident in December 2016 when E.K. injured his ankle kicking his door during another bedtime temper tantrum, but there is no evidence of either parent again using corporal punishment with E.K. Also,

---

[1] Fomby alleged in her initial report that Father had admitted to swatting E.K. about nine to twelve times. At the CHINS hearing, Father testified that Fomby had misunderstood what he said to her; the trial court ultimately found Fomby's allegation of nine to twelve swats to be unproven.

Father readily completed a psychological examination, after which he was diagnosed with bipolar disorder, obsessive compulsive disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder. He was prescribed medication for those conditions, which he takes regularly, but as of the date of the CHINS hearing he had not been referred to therapy. Father also voluntarily participated in an online support and therapy group for bipolar disorder.

[6] DCS requested that E.K. be found a CHINS. The trial court held a hearing on that request on February 7, 2017. No evidence was presented that the parents had been anything but cooperative with DCS since their first involvement with E.K., nor that they had ever violated the "safety plan" they signed. During her testimony, Fomby mentioned "suspicion[s]" of domestic violence between Father and Mother based on interviews with other family members, but DCS introduced no evidence substantiating such suspicions. *Id.* at 49. There was no evidence that E.K. suffers from any psychological or physical problems, and no evidence that the parents' home was inadequate.

[7] On February 7, 2017, the trial court entered its order finding E.K. to be a CHINS, accompanied by findings of fact and conclusions thereon. A dispositional order was entered on March 10, 2017. Father and Mother now appeal.

## Analysis

[8] Father and Mother contend there is insufficient evidence to sustain the trial court's CHINS finding. When reviewing the sufficiency of the evidence for a

trial court's CHINS determination, "'[w]e neither reweigh the evidence nor judge the credibility of the witnesses.'" *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014) (quoting *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012)). We must instead consider only that evidence supporting the trial court's decision and any reasonable inferences drawn therefrom. *Id.* at 1287.

[9]     The trial court here entered sua sponte findings and conclusions supporting its CHINS finding, although such findings and conclusions are not statutorily required. *See id.* "As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *Id.* We review any remaining issues not covered by the findings under the general judgment standard, meaning we will affirm a judgment if it can be sustained on any legal theory supported by the evidence. *Id.* Also, as a general rule appellate courts grant latitude and deference to trial courts in family law matters. *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016). This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record. *Id.*

[10]    There are several statutory circumstances under which a child may be a CHINS. The trial court found E.K. was a CHINS under the following provision:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.[2] DCS bears the burden of proving by a preponderance of the evidence that a child is a CHINS. *Matter of D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017).

[11] A CHINS determination is based on the best interests of the child, not the "'guilt or innocence'" of either parent. *Id.* (quoting *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010)). "The purposes of a CHINS case are to help families in crisis and to protect children, not punish parents." *Id.* However, the government is permitted to forcibly intervene in a family's life only if the family cannot meet a child's needs without coercion—not merely if the family has difficulty meeting the child's needs. *Id.* (quoting *In re S.D.*, 2 N.E.3d at 1286). In order for a child

---

[2] DCS also alleged, but the trial court did not find, that E.K. was a CHINS under Indiana Code Section 31-34-1-2. This statute provides that a child is a CHINS if his or her "physical or mental health is seriously endangered due to injury by the act or omission of the child's parent" and the child "needs care, treatment, or rehabilitation that . . . is unlikely to be provided or accepted without the coercive intervention of the court."

to be a CHINS, DCS must prove not only that one or the other of the parents suffers from shortcomings, but also that the parents are unlikely to meet a child's needs absent coercive court intervention.[3] *Id.* Although a court need not wait until a tragedy occurs before entering a CHINS finding, evidence that a child is endangered is not enough by itself to warrant a CHINS finding. *Id.*

[12] Father and Mother first challenge the trial court's finding that E.K. was in any way endangered. That finding was based largely upon Father's spanking of E.K. with sufficient force to leave bruises on his buttocks. The parents direct us to Indiana Code Section 31-34-1-15(1), which states that the CHINS statutes do not "[l]imit the right of a parent, guardian, or custodian of a child to use reasonable corporal punishment when disciplining the child." They assert that Father's spanking of E.K. did not exceed reasonable bounds. Furthermore, "a parent involved in a CHINS proceeding is not inherently required to repudiate corporal punishment." *Lang v. Starke County Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied.*

---

[3] DCS argues, "Once the juvenile court determines that a child has a CHINS condition, the court may infer that such condition would continue in the absence of court intervention. *In re M.R.*, 452 N.E.2d 1085, 1089 (Ind. Ct. App. 1996) . . . ." Appellee's Br. p. 19. The correct year of the *M.R.* opinion is 1983. More importantly, in two opinions issued earlier this year, this court unequivocally held that *M.R.* is no longer valid authority for the proposition that a court may "infer" coercive court intervention is necessary if a CHINS "condition" exists, as it directly conflicts with subsequent cases from the Indiana Supreme Court. *Matter of N.C.*, 72 N.E.3d 519, 525-26 (Ind. Ct. App. 2017); *Matter of D.P.*, 72 N.E.3d at 985. We must insist that DCS stop citing *M.R.* as valid authority. "[T]he question of whether coercive intervention is necessary is a separate and distinct element of a CHINS action that DCS must prove." *Matter of D.P.*, 72 N.E.3d at 985.

[13]   We need not definitively resolve whether Father's spanking of E.K. exceeded reasonable limits. Even if it did, and even if E.K. was endangered thereby, DCS failed to prove that the coercive intervention of the trial court was needed to protect E.K. When determining whether a child is a CHINS, particularly in weighing the "coercive intervention" element, courts "'should consider the family's condition not just when the case was filed, but also when it is heard.' Doing so avoids punishing parents for past mistakes when they have already corrected them." *In re D.J. v. Indiana Dep't of Child Servs.*, 68 N.E.3d 574, 580-81 (Ind. 2017) (quoting *In re S.D.*, 2 N.E.3d at 1290). Parents who make positive changes in their lives should be applauded, rather than being subjected to the coercion of a CHINS finding. *See In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013). A CHINS finding cannot be entered if the "coercive intervention" element is unproven, particularly in light of the potential negative collateral consequences of such a finding, including relaxing the State's burden for eventually terminating parental rights. *In re S.D.*, 2 N.E.3d at 1290.

[14]   Here, DCS's initial intervention was based upon one incident in which Father spanked E.K. too hard in an effort to cease an ongoing temper tantrum. There is no evidence Father previously had ever excessively disciplined E.K. In the two years prior to that occasion, no one at the daycare where E.K. went had ever noticed any inappropriate marks or bruises. After the incident, Father and Mother fully cooperated with DCS. They signed a "safety plan," which included a prohibition on corporal punishment, which they never violated. They voluntarily engaged with a home-based counseling program, which they

believed was helping them better address E.K.'s temper tantrums. They planned on continuing with that program. Father underwent a psychological examination and was complying with treatment recommendations thereafter, and voluntary participated in an online support group for persons with bipolar disorder. There is no evidence E.K.'s basic needs, such as food, shelter, and medical care, had ever been neglected or endangered. DCS never felt it was necessary to remove E.K. from his parents' care.

[15] DCS argues that despite this evidence, coercive court intervention still is needed in this family's life because of the December 2016 incident in which E.K. injured himself during another bedtime temper tantrum. However, parents under investigation by DCS are not obligated to absolutely guarantee that a child never is hurt or endangered, or that the child never engages in inappropriate behavior, lest the child be declared a CHINS. Rather, the question is whether the parents must be coerced into providing or accepting necessary treatment for their child. *See In re S.D.*, 2 N.E.3d at 1289-90 (reversing CHINS determination where child had special medical needs and mother had not completed necessary training to address those needs, but there was a lack of evidence that mother would need to be coerced into completing the training); *In re V.H.*, 967 N.E.2d 1066, 1072-73 (Ind. Ct. App. 2012) (reversing CHINS determination where child had ongoing, severe behavioral problems but mother was obtaining treatment for child to address those problems). Father and Mother were doing their best to learn methods to address E.K.'s temper tantrums without resorting to corporal punishment; the

fact that on one occasion E.K. managed to hurt himself during such a tantrum may establish that he still is endangered, but not that the parents have to be coerced to address that endangerment.

[16] DCS also contends that Father's psychological problems warranted the CHINS finding. However, the record shows that Father was doing all that was recommended, and beyond, to address those problems. There is no evidence that those problems as currently being addressed by Father pose a risk to E.K. Also, to the extent Father may need more treatment to address his diagnoses, there is no indication that he would need to be coerced into such treatment, given his conduct since DCS's intervention. We cannot say that Father's mental health supports a CHINS finding. *See In re S.A.*, 15 N.E.3d 602, 612 (Ind. Ct. App. 2015) (holding father's PTSD diagnosis did not support CHINS finding where father had been voluntarily addressing it and there was no evidence father would need to be coerced into obtaining additional treatment if necessary), *aff'd on r'hg*, 27 N.E.3d 287 (Ind. Ct. App. 2015), *trans. denied*.

[17] Even if this family needed help to address E.K.'s behavior and Father's mental health, the parents were readily accepting that help and there is no evidence that they needed to be coerced by a court into accepting such help. One lapse in judgment by Father is not enough to warrant a CHINS finding for E.K., where the parents have been fully cooperative in addressing that lapse. Also, we note the possibility of an informal adjustment program, which would be an agreement between DCS and the family allowing the family to participate in DCS services without E.K. being formally declared a CHINS. *See K.B. v.*

*Indiana Dep't of Child Servs.*, 24 N.E.3d 997, 1005 (Ind. Ct. App. 2015) (citing I.C. ch. 31-34-8). It is unclear from the record whether the parties here discussed the possibility of such a program.

# Conclusion

There is insufficient evidence that the coercive intervention of a court is necessary to protect E.K. As such, we must reverse the finding that E.K. is a CHINS.

Reversed.

May, J., and Bradford, J., concur.