## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 11 2018, 8:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Office
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: A.V. & E.V. (Children Alleged to be in Need of Services) and A.P. (Mother);

A.P. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

April 11, 2018

Court of Appeals Case No. 25A04-1710-JC-2366

Appeal from the Fulton Circuit Court

The Honorable Arthur Christopher Lee, Judge

Trial Court Cause No. 25C01-1705-JC-93 25C01-1705-JC-94

**May, Judge.**

A.P. ("Mother") appeals the adjudication of her children, A.V. and E.V. (collectively, "Children") as Children in Need of Services ("CHINS"). She presents multiple issues for our review, which we consolidate and restate as:

> 1. Whether the Department of Child Services ("DCS") presented sufficient evidence to support the trial court's findings regarding E.V.'s burn injury; and

> 2. Whether the unchallenged findings supported the trial court's conclusion Children were CHINS.

We affirm.

## Facts and Procedural History

Mother and J.V. ("Father")[1] are the parents of A.V. and E.V., born June 8, 2011, and July 24, 2015, respectively. At the time of these events, Children lived with Mother and her boyfriend, R.G. ("Boyfriend"). On May 5, 2017, DCS received a report that E.V. had been admitted to the hospital with second and third degree burns on his head and neck. Upon examination, doctors discovered E.V. also had a torn frenulum.[2] DCS investigated and discovered E.V. had sustained the burns on May 2, 2017, but Mother did not take him to the hospital until three days later.

---

[1] Father does not participate in this appeal.

[2] The frenulum "is a piece of skin underneath the upper lip." (Tr. Vol. II at 16.)

[4] When asked how the burns occurred, Mother told the Family Case Manager ("FCM") that she worked most of the day on May 2, 2017, and did not see E.V. after she arrived home at a late hour. On May 3, 2017, while Mother was on her way to work, Boyfriend called her and said she "was going to be mad at him." (Tr. Vol. II at 148.) Boyfriend told Mother that during the previous day's bath, "[E.V.] was playing in the tub, reached for a toy, and he got burned." (*Id.*) Boyfriend told Mother "it was just a few red marks . . . it will go away in a couple days." (*Id.*)

[5] Mother called maternal grandmother ("Grandmother"), who lived nearby, and asked her to check on E.V. Grandmother went to Mother's house, where Boyfriend and E.V. were watching television in the living room. Grandmother noticed E.V.'s burns were more severe than Boyfriend reported. Grandmother took E.V. to her house, gave him an antiseptic bath, let E.V. air dry, applied Silvadene[3] cream to his burns, and wrapped them. Grandmother also gave E.V. Tylenol.

[6] Mother left work shortly thereafter and told Boyfriend to leave her house. Mother arrived at Grandmother's house and observed E.V.'s burn looked like "road rash." (*Id.* at 153.) Mother indicated she did not take E.V. to the emergency room because she respected the advice of Grandmother, who worked as "qualified medication aid," (*id.* at 185), and had training in CPR and

---

[3] Dr. Thompson testified the difference between Silvadene and Eucerin lotion is, "Silvadene cream has an antibiotic in it. Eucerin is just -- is Vaseline -- similar to Vaseline." (Tr. Vol. II at 61.)

first aid. On May 4, 2017, Mother went to work and left Children in Grandmother's care. On Friday, May 5, 2017, Mother took E.V. to his local pediatrician. The pediatrician referred E.V. to Woodlawn Hospital for treatment.

[7] At Woodlawn, doctors treated E.V.'s burns and also observed his torn frenulum. In addition, E.V. underwent a skeletal survey, which is "a series of plain radiograph x-rays done on children less than two who you suspect have been abused." (*Id*. at 19.) The skeletal survey revealed a partially healed spiral fracture of E.V.'s right humerus. Mother told doctors she did not know how E.V.'s arm was injured or how he tore his frenulum.

[8] Based on the severity of E.V.'s burn injuries and the subsequently-discovered additional injuries, E.V. was then transferred to Riley Hospital for Children in Indianapolis for consultation with Pediatric Evaluation and Diagnostic Services ("PEDS"), which provides "[DCS] with 24/7 access to a child abuse pediatrician when they were evaluating potential cases of child maltreatment[.]" (*Id*. at 12.) Dr. Shannon Thompson, who examined E.V., stated it was mandatory for "any child less than three who had a burn or a fracture" to be referred to PEDS. (*Id*. at 13.)

[9] Dr. Thompson testified the nurse practitioner who initially examined E.V. at Riley observed, "pink tinged skin on the forehead extending to the hairline, and in [sic] the back of the neck extending into the hairline and down between the shoulders." (*Id*. at 23.) Based on those observations and her own examination,

Dr. Thompson determined E.V. had second degree burns, also known as "partial thickness" and "deep partial thickness" burns. (*Id.* at 19.) She also indicated there was a small area that was a third degree, or "full-thickness" burn. (*Id.*) The burns covered approximately nine percent of E.V.'s body, mostly in the head and neck area. Dr. Thompson also watched a video of A.V. explaining how the contraption that caused E.V.'s burns worked and then testified:

> What [Mother] described was that she was told that E.V. was being given a bath, and he was reaching for a toy and in doing so his head got under the flow of water. We already had clarified -- took a video reenactment from A.V. about how that water was essentially jimmied up.
>
> So the water was not coming from the actual bath faucet because apparently there was a child safety apparatus of some sort, but the water coming from the sink was measured at 131 degrees relatively quickly. There was a big plastic -- the top of a big plastic (indiscernible) put underneath the faucet and kind of angled at the bathtub. So our assumption was that if he was in the bathtub, somehow he got his hand [sic] underneath that hot water.

(*Id.* at 21-2.)

[10] On May 8, 2017, DCS filed petitions alleging Children were CHINS. On May 11, 2017, E.V. was released from Riley after treatment for his burns and the scheduling of follow up appointments with Riley's burn specialists and orthopedic services. Children returned home with Mother. The trial court held an initial hearing on the petitions on May 11, 2017. Shortly before the hearing,

DCS learned of an earlier incident involving E.V. wherein Mother took E.V. to the emergency room on January 25, 2017, for a high fever. During that visit, Mother sent Father a picture of E.V., who had bruises on his face. Mother told Father the bruises happened when E.V. fell on Boyfriend's exercise equipment. The FCM testified she was concerned after learning of the additional injury. At the initial hearing on May 11, 2017, Children were placed in Father's care, where they have remained throughout these proceedings.

[11] On June 8, 2017, the State charged Mother with Level 6 felony neglect of a dependent based on the burn incident. The State issued a no-contact order between Mother and E.V., which was later dismissed. On August 24, 2017, the trial court held a fact-finding hearing. On August 24, 2017, the trial court adjudicated Children as CHINS. On September 7, 2017, the trial court held a dispositional hearing and entered a dispositional order on September 12, 2017, ordering Mother and Father to participate in services.

# Discussion and Decision

[12] A CHINS proceeding is civil in nature, so DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Indiana Code section 31-34-1-1 states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or

neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

A CHINS adjudication "focuses on the condition of the child," and not the culpability of the parent. *In re N.E.*, 919 N.E.2d at 105. The purpose of finding a child to be a CHINS is to provide proper services for the benefit of the child, not to punish the parent. *Id.* at 106.

[13] When a juvenile court enters findings of fact and conclusions of law in a CHINS decision, we apply a two-tiered review. *Parmeter v. Cass Cty. DCS*, 878 N.E.2d 444, 450 (Ind. Ct. App. 2007), *reh'g denied*. We first consider whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We may not set aside the findings or judgment unless they are clearly erroneous. *Id.* Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We give due regard to the juvenile court's ability to assess witness credibility and we do not reweigh the evidence; we instead consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* We defer substantially to findings of fact, but not to conclusions of law. *Id.*

[14] Mother challenges the trial court's finding that states in relevant part:

> [E.V.] received significant burns and did not receive treatment or evaluation from a medical [sic] for a period of three days after the accident. . . .

> [E.V.'s] health was placed in jeopardy based on the Mother's failure to seek professional medical treatment in a timely fashion. The Court is concerned the Mother does not appreciate this error.

(App. Vol. II at 171.)

[15] Mother argues the first half of that finding is not supported by the evidence because Grandmother treated E.V.'s burns the day after they occurred. Grandmother testified she "was a licensed healthcare provider, certified in first aid and CPR, and employed as a caregiver to children with serious and chronic diseases and developmental issues." (Br. of Appellant at 17.) Grandmother testified she gave E.V. a bath with "antiseptic soap" (Tr. Vol. II at 198), applied "Silvadene creme after [E.V.] air dried," (*id.*), wrapped the burns, and gave E.V. Tylenol.

[16] Mother also contends, as to the second half of that finding, that her delay in seeking treatment from a doctor or the emergency room did not support finding she placed E.V. in jeopardy, and there is "no evidence in the record even suggesting that E.V.'s recovery would have been improved had he been taken to the emergency room, much less evidence suggesting that E.V. was actually

harmed by Mother's decision." (Br. of Appellant at 17.)  Finally, Mother asserts, "Mother did not make any error so there was no error for her to 'appreciate.'" (*Id.* at 17.)

DCS presented the testimony of Dr. Thompson, who treated E.V. at Riley Hospital.  Dr. Thompson testified the severity of E.V.'s burns required "immediate medical care for pain control, fluid, request to (indiscernible), monitoring of infection and treatment of the actual injury to promote healing." (Tr. Vol. II at 59.)  Additionally, while Dr. Thompson agreed Grandmother's treatment of the burn at home was "helpful[,]" (*id.* at 62), she also stated she believed medical neglect occurred based on "[f]ailing to seek medical care that I think a reasonable caregiver would have thought was appropriate of [sic] his significant burn." (*Id.* at 49.)  DCS presented evidence to support the trial court's finding regarding Mother's actions regarding the care of E.V.'s burns. Mother's arguments are invitations for us to reweigh evidence, which we cannot do. *See Parmeter*, 878 N.E.2d at 450 (appellate court cannot reweigh evidence or judge the credibility of witnesses).

## Unchallenged Findings and Conclusions

Mother does not challenge any other of the trial court's findings, and thus they stand as proven. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").  Instead, she argues those findings do not support the trial court's conclusion Children are CHINS.  To prove Children are CHINS,

DCS had to present evidence Children's physical or mental conditions were seriously endangered as a result of Mother's inability, refusal, or neglect in providing medical care and that Children need care they are not receiving and are unlikely to receive without the coercive intervention of the court. *See* Ind. Code § 31-34-1-1. It is possible for a child to not be adjudicated a CHINS, even if that child's well-being is seriously endangered as result of a parent's inability, refusal, or neglect, if DCS failed to present evidence that coercive intervention of the court is needed. *In re S.D.*, 2 N.E.3d 1283, 1288 (Ind. 2014), *reh'g denied*.

### Whether E.V. is a CHINS

[19] The trial court adjudicated E.V. a CHINS, finding and concluding:

> [E.V.] received significant burns and did not receive treatment or evaluation from a medical [sic] for a period of three days after the accident. In addition, it was subsequently discovered the children [sic] had an unevaluated spiral fracture and an unevaluated torn frenulum.
>
> In making this CHINS finding, the Court relies heavily on the testimony of Dr. Shannon Thompson.
>
> [E.V.'s] health was placed in jeopardy based on the Mother's failure to seek professional medical treatment in a timely fashion. The Court is concerned the Mother does not appreciate this error. As such, services with coercive court oversight are necessary to ensure the safety of the children.

(App. Vol. II at 171.) Mother argues the trial court's conclusion is erroneous because it is based "solely on conditions that no longer exist." (Appellant's Br. at 18.)

[20] "[A]n adjudication that a child is dependent and neglected may not be based solely on conditions which existed in the distant past, but exist no longer." *In re C.S.*, 863 N.E.2d 413, 418 (Ind. Ct. App. 2007) (quoting *Matter of D.T.*, 547 N.E.2d 278, 284 (Ind. Ct. App. 1989), *reh'g denied, trans. denied*), *trans. denied*, *abrogated on unrelated grounds by In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). Mother argues the trial court erred when it adjudicated E.V. a CHINS because she had removed Boyfriend from her home, there was no evidence any of E.V.'s injuries occurred in her presence, and she had set the bathtub temperature on low so E.V. would not be burned again.

[21] DCS does not dispute that Mother required Boyfriend to leave her house and he has not returned. However, DCS presented evidence Mother did not know how E.V. sustained the spiral fracture to his arm or how he tore his frenulum. Dr. Thompson testified she believed E.V. was a victim of medical neglect based on Mother's delay in seeking treatment for E.V.'s burns, and she also testified she believed there was evidence E.V. had been the victim of physical abuse based on the fact he "presented with a healing fracture of the arm with no story." (Tr. Vol. II at 49.) Finally, Mother did not present evidence the rerouting of hot water from the sink to the bathtub that resulted in E.V.'s burns had been fixed. Mother's arguments are invitations for us to reweigh evidence, which we cannot do. *See Parmeter*, 878 N.E.2d at 450 (appellate court cannot

reweigh evidence or judge the credibility of witnesses). We conclude the trial court's conclusion that E.V. was seriously endangered because of Mother's neglect was supported by the findings. *See In re C.B.*, 865 N.E.2d 1068, 1073 (Ind. Ct. App. 2007) (findings supported conclusion child's well-being was endangered by mother's delay in seeking medical treatment for multiple injuries attributable to abuse that child sustained while in mother's care and custody), *trans. denied*.

[22] Mother also argues "there is no evidence that Mother was not likely to care for his [sic] children without coercive intervention of the Court." (Br. of Appellant at 19.) She contends "[t]his case comes down to a doctor in Indianapolis thinking Mother should have gone to the emergency room rather than schedule an appointment with the child's pediatrician. The doctor's decision to second-guess Mother's care does not establish a CHINS." (*Id.*)

[23] "Not every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d at 1287. Here, FCM Rainey testified Mother took E.V. "to the doctor's appointments that were made at Riley and any further appointments that were made through Woodlawn Hospital or any of their providers after being released from the hospital[.]" (Tr. Vol. II at 107.) However, FCM Samuel testified Mother had not completed the parenting assessment used to determine if it was safe for Children to return to her care. Additionally, he testified:

Besides participating in the visitation and starting the parenting assessments, Mom's attitude with it is still denial of, you know, wrongdoing or that this was an incident of abuse or neglect, not wanting to take accountability for those things, and if that issue is not being recognized then it's difficult to address that and say there's not going to be safety problems when they go back home.

(*Id.* at 132.) Mother's argument is an invitation for us to reweigh the evidence, which we cannot do. *See Parmeter*, 878 N.E.2d at 450 (appellate court cannot reweigh evidence or judge the credibility of witnesses). We conclude the trial court's findings support its conclusion that coercive intervention of the court is necessary to ensure E.V. receives necessary care and treatment. *Contra Matter of E.K.*, 83 N.E.3d 1256, 1262 (Ind. Ct. App. 2017) (reversing CHINS adjudication because DCS did not prove coercive intervention of the court was necessary when parents had made great strides in addressing the issues that resulted in CHINS investigation, retained custody of their children, and were actively participating in treatment), *trans. denied*.

### Whether A.V. is a CHINS

Mother asserts six-year-old A.V. is not a CHINS because

A.V. never received an injury and there was no evidence she was even left alone with [Boyfriend]. Moreover, A.V.'s older age also makes it less likely that her health was ever placed in substantial danger in this case. Older kids can verbalize pain and concerns about their health that a younger child cannot.

(Br. of Appellant at 20.) While the trial court did not make findings[4] regarding any incidents involving A.V., "the CHINS statute does not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS if his or her physical or mental condition is endangered." *K.B. v. Indiana Dept. of Child Services*, 24 N.E.3d 997, 1003 (Ind. Ct. App. 2015).

[25] DCS presented evidence A.V. told FCM Rainey that she was afraid of Boyfriend and he sat on her one time as punishment, but A.V. had not told Mother. Regarding A.V., Dr. Thompson testified:

> [DCS]: Despite the absence of injuries beyond the scratch to the back of the leg, would you have concerns for [A.V.'s] safety in the same home where E.V. sustained these injuries?
>
> [Thompson]:Yes.
>
> [DCS]: Why is that?
>
> [Thompson]:Because it is very clear in literature when one child is a victim of maltreatment, the other child -- children are at high-risk. In fact, in this particular case, [FCM] Rainey provided me with information of when she spoke with A.V. who expressed -- had a fear of her caretaker in that home and an incident in which she was sat upon.

---

[4] The trial court's order was minimally sufficient at best. It did not include many findings specific to this case and was rife with grammatical and typographical errors. These inadequacies hindered our review.

So clearly there's maltreatment. There was clearly maltreatment occurring in the home that she was witnessing. So that, plus the fact that E.V. was -- had medical neglect as well as physical abuse, in my opinion, and yeah, she's at risk in the same environment.

[DCS]:      Have any studies been done to show whether there's a higher probability of injury to siblings in the same home as a victim of abuse or neglect?

[Thompson]:Yes, there's a number of them. I don't happen to know them off the top of my head, but there's at least several studies on children who had injury, a home where there's physical abuse, as well as other siblings having injury or being found to have injury when they're evaluated as an index -- as a sibling of an index child who has been abused in the home.

(Tr. Vol. II at 50-1.)

[26]     Regarding whether the court's coercive intervention was necessary, we note the same reasons intervention was necessary for E.V. apply here: Mother did not complete the required parenting assessments to ensure Children were safe in her care, and Mother's general attitude of denial of wrongdoing. Mother's arguments are invitations for us to reweigh the evidence, which we cannot do. *See Parmeter*, 878 N.E.2d at 450 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Based thereon, we conclude DCS presented evidence to support the trial court's adjudication of A.V. as a CHINS. *Contra Matter of E.K.*, 83 N.E.3d at 1262 (reversing CHINS adjudication because DCS did not prove coercive intervention of the court was necessary when parents had made great strides in addressing the issues that resulted in CHINS

investigation, retained custody of their children, and were actively participating in treatment).

# Conclusion

[27]     DCS presented sufficient evidence to support the trial court's findings regarding Children. Those findings supported the trial court's conclusions Children were CHINS. We accordingly affirm.

[28]     Affirmed.

Riley, J., and Mathias, J., concur.