## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 20 2019, 7:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT S.L.

Marianne Woolbert
Anderson, Indiana

ATTORNEY FOR APPELLANT S.N.

Dorothy Ferguson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Matter of J.M., J.T., & M.N. (Minor Children), Children in Need of Services, and<br><br>S.L. (Mother) and S.N. (Father),<br><br>*Appellants-Respondents*,<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | December 20, 2019<br><br>Court of Appeals Case No. 19A-JC-802<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable G. George Pancol, Judge<br><br>The Honorable Jack Brinkman, Referee<br><br>Trial Court Cause Nos. 48C02-1902-JC-7, -8, -9 |

**Crone, Judge.**

## Case Summary

[1] S.L. ("Mother") appeals the trial court's orders adjudicating her three children, J.M., J.T., and M.N. (collectively "the Children") children in need of services ("CHINS"). S.N. ("Father") appeals the CHINS adjudication with respect to his child, M.N.[1] Both Mother and Father challenge the sufficiency of the evidence to support the CHINS adjudications. Finding the evidence sufficient, we affirm.

## Facts and Procedural History

[2] The facts most favorable to the CHINS adjudications are as follows. Around 3:00 p.m. on January 7, 2019, Elwood Police Department officers received a report concerning a child stranded outside in the cold and rain on the front porch of an Elwood home. Officers Jerry Branson and Will Nalluvac arrived at the home and found seven-year-old J.M. holding onto the front door handle and crying in distress. They determined his identity through information in his bookbag. They called the resource officer at his school and ascertained that he lived there. Meanwhile, they knocked repeatedly on the front door and on the windows around the sides and back of the house, and Officer Branson heard a loud slamming sound. Eventually, Mother came to the door in her pajamas. She refused the officers' request to enter the home, but when the officers learned of an active search warrant for Father at Mother's address, she allowed them to

---

[1] J.M.'s and J.T.'s fathers are not participating in this appeal.

enter. Mother initially told them that there was no one else in the home, but they heard a child's cry and discovered two-year-old M.N., who had been napping with Mother. The officers searched the home, and when they descended some stairs through a trap door in the laundry room, they found Father hiding in the crawl space portion of the cellar. Father had a small quantity of methamphetamine in his pocket. At some point during the search, sixteen-year-old J.T. came home from school and phoned Mother's sister ("Aunt"), saying, "I think they're going to arrest Mom …. Please, please get here." Tr. Vol. 2 at 73.

[3] The officers arrested Father for methamphetamine possession and probation violations and arrested Mother for aiding a criminal. One of the officers asked Aunt to take the Children to her home. Police contacted the Indiana Department of Child Services ("DCS"), and DCS Family Case Manager ("FCM") Andrea Dickerson went to Aunt's home and assessed the situation. Aunt indicated that she intended to bail out Mother from jail that night, and FCM Dickerson became concerned that the Children would go back home with Mother. Because Mother had a history with DCS that included a previous CHINS case in which the toddler M.N. ingested Suboxone that she found in Mother's purse, and because illegal drugs had been found in Mother's home earlier that day, the Children were removed and put in a relative placement with their maternal grandparents ("Grandparents").

[4] The following day, the trial court conducted a detention hearing, and both Mother and Father refused to submit to drug screens. DCS filed CHINS

petitions alleging that Mother had left J.M. outside in the cold and rain without access to the house, that she had denied the officers entrance to her home and had behaved erratically during the eventual search of her home, that she had harbored Father in her home and had lied about his presence there, that Father was discovered with methamphetamine on his person, that Mother had used illegal substances including methamphetamine, and that Mother and Father both were arrested and incarcerated as a result of the January 7 incident. Both Mother and Father denied the CHINS allegations. During the pendency of the CHINS proceedings, Father remained incarcerated due to the execution of his previously suspended four-year sentence in an unrelated criminal case. Mother did not participate in any services except supervised visitation, and she refused to allow DCS inside her home to evaluate her living conditions. DCS referred J.T. for older youth services and the Children for group therapy through the Children's Bureau.

[5] The trial court conducted a factfinding hearing, with Mother present and Father present telephonically and by counsel. At the close of the hearing, the court found the allegations in the CHINS petitions to be true and adjudicated the Children as CHINS. The court ordered Mother to participate in services, allow DCS into her home, and take steps to ensure the safety of her home. The court advised Father to participate in whatever reasonable services are offered in the Department of Correction and to use alternate means such as mail and Skype to communicate with M.N. Mother appeals the CHINS adjudications as to all of

the Children, and Father appeals the CHINS adjudication as to M.N. Additional facts will be provided as necessary.

# Discussion and Decision

[6] Mother challenges the sufficiency of the evidence supporting the CHINS adjudications as to the Children, and Father challenges the sufficiency of the evidence supporting the CHINS adjudication as to M.N. Appellate courts generally grant latitude and deference to trial courts in family law matters. *Matter of E.K.*, 83 N.E.3d 1256, 1260 (Ind. Ct. App. 2017), *trans. denied* (2018). This deference recognizes the trial court's "unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record." *Id*. Thus, when reviewing the sufficiency of evidence, we neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the trial court's decision. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012).

[7] Here, none of the parties requested written findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), and the trial court did not issue findings sua sponte. Special findings are not required in a CHINS factfinding order. *In re S.D.*, 2 N.E.3d 1283, 1288 (Ind. 2014); *see also Matter of N.C.*, 72 N.E.3d 519, 523 n.2 (Ind. Ct. App. 2017) (unlike dispositional order, factfinding order is not required to include formal findings). Where the parties do not request written findings and the trial court does not issue them sua

sponte, we apply a general judgment standard and may affirm the judgment if it can be sustained on any legal theory supported by the evidence. *S.D.*, 2 N.E.3d at 1287; *Samples v. Wilson*, 12 N.E.3d 946, 949-50 (Ind. Ct. App. 2014).

[8] In a CHINS proceeding, DCS bears the burden of proving by a preponderance of the evidence that a child meets the statutory definition of a CHINS. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). To meet its burden of establishing CHINS status, DCS must prove that the child is under age eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.

[9] Although the acts or omissions of one or both parents can cause a condition that creates the need for court intervention, the CHINS designation focuses on the condition of the children rather than on an act or omission of the parent(s). *N.E.*, 919 N.E.2d at 105. In other words, despite a "certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a

CHINS adjudication is simply that – a determination that a child is in need of services." *Id*. (citations omitted).

[10] Both parents claim that the evidence is insufficient to support the trial court's determination that (1) the Children are seriously endangered; and that (2) the Children have unmet needs; (3) that are unlikely to be provided or accepted without the court's coercive intervention. Father's argument pertains only to his child, M.N.; Mother's pertains to all the Children. Three-year-old M.N. was previously adjudicated a CHINS after she ingested Suboxone that she found in Mother's purse. This evidence is relevant in the present case, as it has implications concerning Mother's ability to protect the Children from dangerous situations. *See Matter of Eq.W.*, 124 N.E.3d 1201, 1211 (Ind. 2019) ("Past acts by parents can be relevant to new CHINS filings involving the same parents and children."). "[A] parent's past, present, and future ability to provide sufficient care for his or her child forms the basis of a CHINS adjudication [and the] parent's character is an integral part of assessing that ability." *Id*. at 1210 (quoting *Matter of J.L.V., Jr.*, 667 N.E.2d 186, 190-91 (Ind. Ct. App. 1996)). Mother cites her completion of services in (and the ultimate closure of) the previous CHINS case as evidence that the Children are not currently seriously endangered and that she no longer needs the court's coercive intervention to protect the Children and provide for their needs. We find the record sufficient to support the court's conclusion to the contrary.

[11] In addition to the most obvious examples of M.N. ingesting Suboxone and J.M. being locked outside in the cold and rain, all three of the Children have been

seriously endangered by their exposure to Mother and Father's lifestyle. The record shows both Mother and Father to be drug users. It also shows their relationship, whether currently romantic or not, to be a bonded one. For example, police discovered that there was an active search warrant for Father, a probationer, at Mother's address. Mother lied to the officers as to both M.N.'s presence and Father's presence in the home. When the officers searched her home, they found Father's clothing and other belongings strewn about Mother's bedroom and in her closet and found cigarette butts in ashtrays on both sides of the bed. They heard a loud slamming noise while outside on the porch with the stranded J.M. and, not long after, found Father hiding in the cellar crawl space accessed by a trap door. Father had a small quantity of illegal drugs in his pocket. The pajama-clad Mother's behavior with the officers was reflective not merely of sleepiness, but it also led them to question whether she might be under the influence. Tr. Vol. 2 at 19. Officer Nalluvac described her demeanor as going back and forth from cooperative to yelling and cursing. *Id.* at 30.

[12] Mother claimed that she did not leave the Children's needs unmet because, when she knew she would be arrested, she called Aunt for help with the Children. However, Aunt testified that it was actually J.T. who called her for help, and that it was one of the officers who asked her to take the Children to her house. *Id.* at 72-73, 76.

[13] Father and Mother both claim that Mother did not knowingly harbor Father in her cellar but that he had accessed the house through a broken and boarded

window in the back of the home. We decline their invitations to reweigh evidence. That said, even the accounts offered by Father and Mother do not reflect well on Father who, by his own account, essentially admitted to breaking and entering Mother's home. Nor do they reflect well on Mother's ability to keep the Children safe; she was aware that the broken window had been covered by a board for four years, yet, she described her neighborhood as rough and explained that break-ins to her vehicle and garage had precipitated her purchase of a surveillance camera. The trial court referenced surveillance tape footage introduced by Mother at the hearing and remarked about Mother's apparent lack of concern about seven-year-old J.M.'s having been locked outside in January weather for fifteen to twenty minutes. *See id.* at 84 ("That [video] gave me a clear idea of what was going on here…. You didn't seem concerned as a mother that [J.M.] was out there with police officers and the safety and welfare of [J.M.].").[2]

[14] Both Father and Mother characterize the events of January 7 as an isolated incident concerning only J.M. and not indicative of their daily living. Again, we decline their invitations to reweigh evidence. We also reject their argument that the incident has no implications concerning M.N. and J.T., who were members of a household where drugs were found and a criminal/probation violator was harbored and were present for part or all of the January 7 incident.

---

[2] The surveillance video is not included in the record on appeal. Nor is Mother's exhibit concerning a safety plan that she allegedly made with Aunt.

[15] Moreover, even after the January 7 incident, the following occurred: both Mother and Father refused to submit to drug screens at the detention hearing; Father remained incarcerated and is scheduled to execute at least two years of his previously suspended sentence; Mother refused to participate in any services other than supervised visitation; and Mother refused to allow DCS inside her home for an evaluation. These repeated refusals underscore the need for the court's coercive intervention. These are precisely the types of circumstances that the CHINS statutes were designed to address.

[16] The evidence is sufficient to support the CHINS adjudications as to all three of the Children. Accordingly, we affirm.

[17] Affirmed.

Baker, J., and Kirsch, J., concur.