## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 10 2020, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of I.S. and J.S. (Children Alleged to be in Need of Services) and E.S. (Father);

E.S. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

AND

Child Advocates, Inc.,

*Appellee - Guardian ad Litem*

September 10, 2020

Court of Appeals Case No. 20A-JC-706

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Danielle Gaughan, Magistrate

Trial Court Cause No. 49D09-1909-JC-2336 49D09-1909-JC-2337

**May, Judge.**

[1] E.S. ("Father") appeals the adjudication of his children, I.S. and J.S., (collectively, "Children"), as Children in Need of Services ("CHINS"). He argues some of the trial court's findings are not supported by the evidence and that the remaining findings do not support the juvenile court's adjudication of Children as CHINS. We affirm.

# Facts and Procedural History

[2] J.T. ("Mother") and Father are the parents of I.S., born July 20, 2008; and J.S., born May 13, 2011. Mother was the custodial parent of Children, and Father exercised parenting time every other weekend and one evening a week. Father is married to A.S. ("Stepmother"), who has one daughter ("Stepsister") who lives with Father and Stepmother.

[3] On September 3, 2019, the Department of Child Services ("DCS") received a report that J.S., then eight years old, had reported that I.S., then eleven years old, had touched him inappropriately in a sexual manner. DCS conducted an investigation, including interviews with Children, Mother, and Father, during which I.S. admitted she touched J.S. inappropriately while at Mother's home. On September 5, 2019, DCS removed Children from Mother's home and

placed J.S. with Father. I.S. was placed first with other relatives, and then ended up in shelter care at Courage Center because no options for relative care existed at which there were no younger children.

[4]     On September 9, 2019, DCS filed a petition alleging Children were CHINS. The juvenile court held a fact-finding hearing on the CHINS petition on December 18, 2019. Mother admitted Children were CHINS at that hearing. The juvenile court took the admission under advisement until the completion of Father's fact-finding hearing on December 23, 2019. Father was present at both fact-finding hearings and stipulated to the Children's statements during their interviews, which included J.S.'s allegation of sexual abuse and I.S.'s admission that she was the perpetrator of that sexual abuse, but Father denied Children were CHINS. He proposed the custody arrangement be changed so that Children could live with him, Stepmother, and Stepsister. Father testified he planned to engage Children with therapists who were covered by his insurance.

[5]     However, at the time of Father's proposal, Children had been active in individual therapy for approximately two-and-one-half months. I.S. was working with a Credentialed Sexually Abusive Youth Clinician ("CSAYC") to address sexually maladaptive behavior, and J.S. was working with a therapist who specializes in trauma. Under Father's plan, the Children would have to change therapists, which was not recommended by their current therapists because doing so would slow the progress already made in therapy.

Children's therapists also agreed it would not be in either child's best interests for Children to live in the same house. J.S.'s therapist testified that J.S. had not "made much progress towards reconciling his negative emotions about the abuse" and "he needs to work through that . . . those anger feelings that he has before he can go back to living with [I.S.]." (Tr. Vol. II at 79.) I.S.'s therapist recommended that her "treatment be completed before they're placed together" because "[i]f [I.S.] has shown inappropriate behaviors in the past, which she reportedly has, then it's . . . based on current research, unlikely that those behaviors would stop without the treatment having been completed." (*Id*. at 70.)

Father testified he had created a safety plan in the event Children were placed with him. In the plan, J.S. would have his own room, and I.S. would share a room with Stepsister. Father, who works in the evening, and Stepmother, who works during the day, would supervise Children by "watching them all day, every day." (*Id*. at 46.) Father asked the juvenile court to not adjudicate Children as CHINS and grant him primary custody of Children. The juvenile court took the matter under advisement.

On January 21, 2020, the juvenile court entered its order adjudicating Children as CHINS. On February 19, 2020, the juvenile court held a dispositional hearing and the next day entered its dispositional decree. The court ordered that J.S. remain placed with Father, I.S. remain placed in shelter care at Courage Center, Children participate in individualized therapy, and Mother have visitation with Children.

# Discussion and Decision

[9] Father challenges Children's adjudications as CHINS. A CHINS proceeding is civil in nature, so DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). The CHINS petition was filed pursuant to Ind. Code § 31-34-1-1, which states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>>
>> (2) the child needs care, treatment, or rehabilitation that:
>>
>>> (A) the child is not receiving; and
>>>
>>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[10] Under Indiana Code section 31-34-1-2, the State must prove that "the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian." Under Indiana Code section 31-34-1-3, the State must prove the child was a victim of a sexual offense and "needs care, treatment, or rehabilitation that: (A) the child is not

receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court."

[11] A CHINS adjudication focuses on the needs and condition of the child, and not the culpability of the parent. *In re N.E.*, 919 N.E.2d at 105. The purpose of a CHINS adjudication is not to punish the parent, but to provide proper services for the benefit of the child. *Id*. at 106. "[T]he acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id*. at 105. "A CHINS adjudication can also come about through no wrongdoing on the part of either parent[.]" *Id*.

> While we acknowledge a certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that - a determination that a child is in need of services. Standing alone, a CHINS adjudication does not establish culpability on the part of a particular parent. Only when the State moves to terminate a particular parent's rights does an allegation of fault attach. We have previously made it clear that CHINS proceedings are "distinct from" involuntary termination proceedings. The termination of the parent-child relationship is not merely a continuing stage of the CHINS proceeding. In fact, a CHINS intervention in no way challenges the general competency of a parent to continue a relationship with the child.

*Id*. (citations omitted).

[12] When a juvenile court enters findings of fact and conclusions of law in a CHINS decision, we apply a two-tiered standard of review. *In re Des. B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014). We first consider whether the evidence

supports the findings and then whether the findings support the judgment. *Id*.
We may not set aside the findings or judgment unless they are clearly
erroneous. *Id*. Findings are clearly erroneous when the record contains no
facts to support them either directly or by inference, and a judgment is clearly
erroneous if it relies on an incorrect legal standard. *Id*. We give due regard to
the juvenile court's ability to assess witness credibility and do not reweigh the
evidence; we instead consider the evidence most favorable to the judgment with
all reasonable inferences drawn in favor of the judgment. *Id*. We defer
substantially to findings of fact, but not to conclusions of law. *Id*. Unchallenged
findings "must be accepted as correct." *Madlem v. Arko*, 592 N.E.2d 686, 687
(Ind. 1991).

# 1. Challenged Findings

### *Finding 15*

[13] Father first challenges Finding 15, which states:

> 15. Father stated that if the child in needs [sic] of services case
> closed and both [Children] were placed in his care, Father would
> be able to pay for therapy for [Children] through his insurance.
> Father, at the time of trial, had not identified therapists for
> [Children] and had no real therapeutic plan for [Children].

(App. Vol. II at 172.) Father argues this finding "mischaracterizes the evidence
presented." (Br. of Appellant at 19.) Father directs us to his testimony
regarding his plan for therapy for Children should the juvenile court deny
DCS's petition to declare Children as CHINS and release Children to Father's

custody. Father testified he understood the type of therapy Children needed and would continue that therapy should they be placed in his care. He indicated that he might continue therapy with Children's current therapists and new therapists through his insurance, but he preferred to use a therapist covered by his insurance.

[14] While Father had used an online directory to locate appropriate therapists and contacted Midtown Mental Health, he was unable to begin Children in that therapy until they were no longer under the DCS therapist's care or the DCS therapist transferred Children to a therapist at Midtown Mental Health. Father contends he had a plan for Children's therapeutic needs, but DCS's intervention prevented him from enacting it.

[15] However, the State also presented evidence that Father's safety plan did not have a specific plan for therapy and that Father did not take J.S. to therapy multiple times because J.S. had violin lessons. Children's current therapists testified that continuation of therapy was crucial to reuniting the family and that changing to a new therapist may result in setbacks in each child's recovery. Father's arguments are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re Des. B.*, 2 N.E.3d at 836 (appellate court does not reweigh evidence or judge the credibility of witnesses on appeal). The State presented evidence to support the finding that Father did not have a sufficient plan for Children's therapeutic needs should they be released into his care.

## Findings 12, 18, and 19

[16] Father also challenges Findings 12, 18, and 19 of the juvenile court's order. Those findings concern Father's safety plan and state, in relevant part:

> 12. Fathers [sic] plan is to have [Children] in his care and to ensure the [Children's] safety with line of sight supervision, twenty-four hours a day, seven days a week.
>
> \* \* \* \* \*
>
> 18. . . . Father maintains the [Children] are not in need of services if they are placed in his care. Father contends that he and Step-mother can maintain line of sight supervision at all times to ensure [J.S.'s] safety. Fathers [sic] plan to have line of sight supervision at all times of both [Children] is unrealistic and would be for any parent. Father and Step-mothers [sic] hearing impairment creates an even greater obstacle to their ability to keep [J.S.] safe with [I.S.] residing in the same home. Additionally, therapists are recommending against [Children] residing in the same home at this time. Based on [I.S.'s] past sexual abuse of [J.S.], it is unlikely that those behaviors would not reoccur as she is only in the beginning stages of therapy. [I.S.'s] therapy must be completed before the siblings are placed together. [J.S.] has not made progress toward reconciling his negative emotions surrounding the abuse and his anger is directed at [I.S.]. [J.S.] is also only at the beginning stages of therapy. Placing [Children] together at this time puts [J.S.] at serious risk of additional emotional trauma as well as again being sexually abused by [I.S.].
>
> 19. . . . Fathers [sic] plan to ensure the [Children's] safety is insufficient. Fathers [sic] belief that there will be line of sight supervision of [Children] at all times is unrealistic. Fathers [sic] plan to have [I.S.] share a room with her step-sister is unwise and

puts another child at risk. Father does not have therapy in place for [Children]. Father does not appear to fully understand the severity of [I.S.'s] behaviors and he is therefore unable to keep [Children] safe if they are placed in the same home before their therapy is completed.

(App. Vol. II at 172-3.) Father agrees that a "line of sight" plan is "unrealistic, but he argues that was not the plan." (Br. of Appellant at 22.) Instead, he claims that his safety plan was that Children would be monitored at all times.

[17] Father directs us to his safety plan, wherein he provides for an "informed supervisor" who is an adult, "[f]ree of sex offending history," "[f]ree of any denial" about the situation between Children, and free of illegal drugs and using alcohol "to the point of impairment." (Ex. Vol. I at 26.) If an informed supervisor is not available, under the plan Father is responsible for securing "alternative supervision." (*Id*.) The safety plan indicates J.S. is to not have unsupervised contact with I.S. "either directly or indirectly." (*Id*.) The safety plan sets forth the same supervision requirements for I.S., adding that "I.S. will not be responsible to babysit or care- take for J.S." (*Id*. at 27.)

[18] While we agree the evidence does not support the characterization of Father's supervision plan for Children as one of "line of sight," we disagree with Father that his plan is sufficient. While Father contends that, under his safety plan "there would be no opportunity for sexual abuse to reoccur," (Br. of Appellant at 23), that statement ignores the fact that he works at night, his wife works during the day, and there are no identified alternate caregivers for Children. He does not challenge the juvenile court's findings that he does not fully

understand the nature and severity of the incident that occurred between Children and his plan ignores Children's therapists' recommendations that Children not live together until they have completed therapy.

[19] Further, on appeal, Father continues to argue that the risk of additional abuse by I.S. toward J.S. is not supported by the evidence, despite both therapists testifying to the contrary. J.S.'s therapist reported J.S. should not live with I.S. until J.S. is able to work past a pattern of "anger outburst[s] which involved yelling . . . [and] are directed at [I.S.] right now." (Tr. Vol. II at 79.) I.S.'s therapist testified that she has not identified what led to I.S.'s abuse of J.S. and thus she cannot work toward keeping "it from happening again." (*Id*. at 70.) I.S.'s therapist stated that the "[b]est practice" would be that I.S.'s "treatment must be completed before [Children] are placed together." (*Id*.) Father maintains the fact that Children cannot be placed together until therapy is "completed" is a "vague and intrusive mandate which usurps a Father's right to make his own parenting decisions about his family's and children's future." (Br. of Appellant at 24.)

[20] Father blames the sexual abuse incident between Children on Mother's lack of supervision and contends he provided sufficient supervision for Children during his parenting time and can continue to provide supervision without DCS intervention. However, Father testified that he observed Children "[w]restling" and told them to "stop" and disciplined them prior to the incident, (Tr. Vol. II at 55), and Father's admonishments did not ultimately prevent I.S. from sexually abusing J.S. While we agree that the characterization of Father's plan

as "line of sight" is not necessarily supported by the evidence, it does not change the fact that Father's plan to constantly monitor Children while he is working, his wife is working, and without having identified appropriate alternative caregivers, in addition to seemingly minimizing the seriousness of the situation between Children, is insufficient to meet Children's needs. Father's arguments to the contrary are invitations for us to reweigh the evidence, which we cannot do. *See In re Des. B.*, 2 N.E.3d at 836 (appellate court does not reweigh evidence or judge the credibility of witnesses on appeal).

## 2. Conclusions of Law

[21] Father challenges the juvenile court's conclusions of law supporting its adjudication, and we simply determine whether the findings are sufficient to support the judgment. *In re A.H.,* 751 N.E.2d 690, 695 (Ind. Ct. App. 2001), *trans. denied*. Father argues Children are not CHINS because the incident between Children happened when Children were unsupervised at Mother's house and such an incident would not occur at Father's house. Again, this argument ignores the testimony of Children's therapists who noted each child needed specialized therapy to address what led to the sexual abuse, in I.S.'s case, and how to deal with the anger about the traumatic event, in J.S.'s case.

[22] The fact that the sexual abuse incident between Children occurred while they were in Mother's care and not Father's care does not mean that DCS intervention is not necessary. *See In re N.E.*, 919 N.E.2d at 105 ("the acts or omissions of one parent can cause a condition that creates the need for court

intervention"). Father, who observed inappropriate behaviors between Children prior to the sexual abuse, did not seek treatment before J.S. was traumatized by I.S.'s actions, and Father now questions the recommendations of the therapists in place to help Children. Because of the incident at Mother's house, Children now need therapy, and that therapy has not been provided by either parent, and thus the coercive intervention of the court is needed to provide that therapy.

[23] Further, J.S., who was in Father's care at the time of the juvenile court's order, had missed multiple therapy sessions because Father took him to violin lessons instead, which indicates Father did not make therapy a priority. Based thereon, we cannot say that the juvenile court erred when it adjudicated Children as CHINS. *See Matter of E.K.*, 83 N.E.3d 1256, 1261 (Ind. Ct. App. 2017) ("In order for a child to be a CHINS, DCS must prove not only that *one or the other of the parents* suffers from shortcomings, but also that the parents are *unlikely* to meet a child's needs absent coercive court intervention.") (emphasis added), *trans. denied*; and *contra id*. at 1262 (reversing CHINS adjudication because DCS did not prove coercive intervention of the court was necessary when parents had made great strides in addressing the issues that resulted in CHINS investigation, retained custody of their children, and were actively participating in treatment).

# Conclusion

[24]     We conclude DCS presented sufficient evidence to support Finding 15. Regarding Findings 12, 18, and 19, while we agree the characterization of Father's supervision plan was incorrect, it does not change the evidence that his safety plan was insufficient to meet Children's needs. Based on that evidence and the juvenile court's other findings, we hold the juvenile court did not err when it adjudicated Children as CHINS. Accordingly, we affirm the juvenile court's decision.

[25]     Affirmed.

Riley, J., and Altice, J., concur.