

**FILED**

Mar 21 2017, 8:18 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Noah T. Williams
Monroe Co. Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

N.C. *(Minor Child)*,

   *Child in Need of Services*

      and

J.M. (Father),

*Appellant-Respondent,*

      v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

March 21, 2017

Court of Appeals Case No.
53A01-1610-JC-2479

Appeal from the Monroe Circuit
Court

The Honorable Stephen R. Galvin,
Judge

Trial Court Cause No.
53C07-1605-JC-308

**Robb, Judge.**

## Case Summary and Issue

[1] J.M. ("Father") appeals the juvenile court's finding that his son, N.C., is a child in need of services ("CHINS") and the juvenile court's corresponding dispositional order giving wardship of N.C. to the Indiana Department of Child Services ("DCS") and ordering Father to comply with the terms of a Parent Participation Plan. Father raises two issues for our review, of which we find the following dispositive: whether the juvenile court erred in finding N.C. to be a CHINS. Concluding DCS did not prove by a preponderance of the evidence that the coercive intervention of the court was necessary to ensure N.C.'s care and therefore the juvenile court clearly erred in adjudicating N.C. a CHINS, we reverse.

## Facts and Procedural History

[2] Father and M.C. ("Mother") are the parents of N.C., who was six years old when these proceedings began. Father and Mother do not live together. In addition, Mother has three daughters by three other men: H.M., her oldest, who was not involved in these proceedings; B.C., who was fourteen at the time these proceedings began; and K.T., who was eleven. B.C., K.T., and N.C. were all in Mother's primary custody.

[3] On April 27 and 28, 2016, DCS received reports indicating Mother was using methamphetamine while caring for her children. Stephanie Clephane, a Monroe County DCS family case manager, spoke with each of the children at

school on April 28 and eventually connected with Mother by phone. Mother admitted using methamphetamine in the recent past but refused to meet with Clephane without a court order. Because of Mother's admission, DCS arranged for the children to begin staying with Mother's sister as of April 28. In the ensuing days, Mother had multiple contacts with law enforcement after reporting her house was bugged, making suicidal threats, and complaining her sister would not return the children to her.

[4] On May 5, 2016, the juvenile court authorized the filing of a CHINS petition for all three children. The petition, filed the same day, alleged the children were CHINS because Mother admitted to recently using methamphetamine and refused to submit to requests for a drug screen; Mother was suicidal and admitted to a hospital for treatment; one of the children reported there was domestic violence in the home between Mother and her boyfriend; one of the children reported she believes Mother is using drugs because of her sudden weight loss and odd behavior; Mother refused to cooperate with DCS; and Mother has a history with DCS. The petition also named the children's fathers and noted they are each noncustodial parents.

[5] Father and Mother had a prior case in Monroe Circuit Court concerning support and custody issues regarding N.C.[1] On April 29, 2016, Father filed a petition to modify custody with the Circuit Court, alleging N.C.'s living

---

[1] The case has a DR designation and is captioned "In re the Marriage of." However, it is unclear from the record whether Father and Mother were ever married.

situation was harmful to him and DCS had indicated it was going to take action. The Circuit Court held a hearing on June 30, 2016, at which Father, Mother, and DCS appeared. Mother did not object to Father being awarded temporary custody of N.C. but objected to a final custody determination before the CHINS fact-finding hearing was completed. The Circuit Court noted N.C. was the subject of a CHINS proceeding and that the juvenile court and DCS had both approved placement of N.C. with Father. The Circuit Court found the evidence supported granting Father temporary custody, but "because the parents are not in agreement, and there is a conflict in the testimony regarding the consistency of Father's parenting time . . . and Mother's alleged drug use or negligent care of [N.C.]," the court did not make a permanent change of custody at that time. Appellant's Appendix, Volume II at 90. Instead, "either parent may file a copy of the juvenile court CHINS order . . . and request a hearing if the CHINS case is dismissed [at the fact-finding hearing] for failure to prove or parties are discharged at a later date because the dispositional goals are achieved[,]" and the court would then hold a hearing on either parent's request. *Id.* at 92.

[6] At the CHINS fact-finding hearing on September 1, 2016, the only testimony related to Father was that N.C. had been placed with him pursuant to the Circuit Court order for approximately two months, that DCS had visited Father's home the night before the fact-finding hearing and the visit went very well and everything looked appropriate, and that there were no allegations

against Father. The juvenile court found that all three children were CHINS, concluding:

> Given the ongoing domestic violence and substance abuse in the family home, the negative impact of the domestic violence on the children, [Mother's] history of neglect of her children, and [Mother's] unwillingness to participate in services, the coercive intervention of the court is clearly necessary to protect the health and safety of the children.

*Id.* at 34. The only reference to Father in the juvenile court's findings is that Father is the noncustodial father of N.C.

[7] The juvenile court held a dispositional hearing on September 27, 2016. Lindsey McDonald, the case manager, testified as follows when questioned by Father's attorney:

> Q: How long has [N.C.] been placed [with Father]?
> A: I don't remember the exact date but it's been a couple of months – a few months now.
> * * *
> Q: Has there been a single issue with [Father] and [N.C.] or [N.C.'s] safety?
> A: No.
> Q: Has [Father] refused to do a single thin[g] you've asked him to do?
> A: No.
> Q: In your mind what is the need for coercive – the course of intervention of the Court as it comes to [Father]?
> A: [N.C.] needs to be allowed to have the services with his mother and if any needs arise he needs the opportunity to participate in those services that are offered through DCS.
> Q: Do you think that [Father] would refuse to participate in

anything?

A: These services provided through DCS he wouldn't have to pay for. If he weren't involved in DCS he would be responsible for paying for those services.

Q: Has he given you any indication he wouldn't be willing to do that?

A: No.

Transcript at 62-63. She also testified that Father has made N.C. available for visits with Mother and his siblings. On cross-examination by DCS, McDonald testified that if N.C.'s CHINS case stays open, DCS would be recommending Father stay in contact with the case manager; notify the case manager of any change of address, phone number, household composition, or employment; and if DCS deemed it necessary, submit to a drug screen. McDonald stated DCS had no current concerns that Father was using drugs and no drug screens had yet been requested. Finally, "if the team . . . felt that there was a service that would be appropriate for [Father] if he identified that he needed any kind of assistance, any kind of help maybe, any kind of support, we would ask that he enroll in that program." *Id.* at 64-65.

[8] In closing, Father's attorney noted, "At this point it seems to be the most appropriate thing is to change custody to [Father]. [N.C.] doesn't appear to need services other than visits [Father] is happy [to] facilitate . . . . [Father] doesn't need services. I think we're creating a CHINS case where there need not be one . . . ." *Id.* at 72. Interpreting Father's argument as a request for the juvenile court to issue a permanent custody order and dismiss the CHINS case, the juvenile court stated,

> The Court tends to agree that there is – it's difficult to see the need for a Child In Need of Services case with a child custody order but I do note that there – it is temporary in nature.
>
> * * *
>
> If [Father] can look at me and say I've got a visitation order that limits [Mother's] contact and protects the child then I'm gonna dismiss this case. I don't think you've got that order, right? Okay. So that's gotta be - there's gotta be something in place that ultimately protects this child.

*Id.* at 72-73, 77. Accordingly, the juvenile court determined it was going to issue a dispositional order on all three children and then, with respect to N.C.,

> we're going to figure out where we're going to hold the [custody] hearing, either in this court or [the Circuit] court. I note we maintain concurrent jurisdiction on the issue of custody and if there's a modification of custody then the CHINS case will be dismissed. If there's not a modification of custody obviously then the CHINS case would continue because [Father] would be non-custodial.

*Id.* at 79. The juvenile court then issued a dispositional order that found, "The children require a safe and stable home, free from Domestic violence and the use of controlled substances by their mother. Participation by the parent in the plan of care for the children is necessary to ensure the safety of the children." Appellant's App., Vol. II at 73. The juvenile court ordered the children to each remain in their current home or placement, awarded wardship of the children to DCS, and ordered the family to comply with the recommendations in the

Addendum to the Pre-Dispositional Report prepared by DCS. There were twenty recommendations for Father, including contacting the case manager weekly, allowing announced or unannounced case manager visits to see N.C. and the family home, and submitting to random drug screens on request. Following entry of this dispositional order, Father filed a Notice of Appeal.

# Discussion and Decision

## I. Standard of Review

In order to adjudicate a child a CHINS, DCS must prove by a preponderance of the evidence that

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

> (2) the child needs care, treatment, or rehabilitation that:

>> (A) the child is not receiving; and

>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1; *In re S.A.*, 15 N.E.3d 602, 607 (Ind. Ct. App. 2014), *aff'd on reh'g*, 27 N.E.3d 287 (Ind. Ct. App. 2015), *trans. denied*. In reviewing a CHINS determination, we do not reweigh evidence or assess witness credibility

for ourselves.  *In re S.A.*, 15 N.E.3d at 607.  We consider only the evidence in favor of the juvenile court's judgment, along with any reasonable inferences arising therefrom.  *Id.*

[10]  The juvenile court entered findings of fact and conclusions thereon sua sponte in its order adjudicating N.C. a CHINS.[2]  Our review is therefore governed by Trial Rule 52(A).  For issues covered by the juvenile court's findings, we first consider whether the evidence supports the factual findings and then consider whether those findings support the juvenile court's judgment.  *In re S.A.*, 15 N.E.3d at 607.  We will not set aside the findings or judgment unless they are clearly erroneous.  *Id.*  Findings are clearly erroneous when there are no facts in the record to support them; a judgment is clearly erroneous if it relies on an incorrect legal standard.  *Id.*  We give substantial deference to the court's findings but not to its conclusions.  *Id.*  Any issues not covered by the findings are reviewed under a general judgment standard and the judgment may be affirmed if it can be sustained on any basis supported by the evidence.  *Id.*

## II.  Adjudication as a CHINS

### A.  Subsequent Events

[11]  Before we address the merits of Father's appeal, we note it appears from our review of the lower courts' records that several events have occurred since this

---

[2] Unlike a dispositional order, *see* Ind. Code § 31-34-19-10, a fact-finding order is not required to include formal findings, *In re S.D.*, 2 N.E.3d 1283, 1288 (Ind. 2014).

appeal was initiated. The Chronological Case Summary indicates a review hearing in the CHINS case was set for February 2, 2017.[3] *See* Appellant's App., Vol. II at 5. At the hearing, on Father's motion and with no objection from DCS, the juvenile court ordered the parties discharged in N.C.'s case.[4] On February 23, 2017, Mother wrote to the Circuit Court informing the judge of the resolution of N.C.'s CHINS case and asking for a hearing to modify the existing temporary order granting custody of N.C. to Father by returning custody to her. On March 1, 2017, Father filed a petition for modification of custody with the Circuit Court requesting permanent custody of N.C. A custody modification hearing is currently scheduled in the Circuit Court for June 1, 2017.

[12]     Although at first blush these events may seem to make the issues raised by Father in this appeal moot, we conclude a decision on the merits is warranted and necessary. A CHINS adjudication, even one as short-lived as this one, can have serious consequences for families. Indiana Code section 31-35-2-4(b)(2)(B)(iii) provides that two separate CHINS adjudications can be the basis for a petition to terminate parental rights. Although N.C. is not currently a CHINS, it is still on record that he has been adjudicated a CHINS and if that adjudication was erroneous, it must be corrected to protect the integrity of the

---

[3] Review hearings are required to be held at least every six months. Ind. Code § 31-34-21-2.

[4] The CHINS cases regarding N.C.'s siblings were continued and the dispositional order as to those children remained in effect after the review hearing.

family going forward. *See In re K.D.*, 962 N.E.2d 1249, 1259 (Ind. 2012) (noting "an abundance of caution should be used when interfering with the makeup of a family and entering a legal world that could end up in a separate proceeding with parental rights being terminated").

## B. Need for Coercive Intervention of the Court

[13] With that said, we turn to the first issue raised by Father. Father contends the juvenile court erred in adjudicating N.C. a CHINS because there was no evidence N.C.'s needs would go unmet in the absence of the coercive intervention of the court. The purpose of a CHINS inquiry is to determine whether a child's circumstances require services that are unlikely to be provided without the intervention of the court, and thus, the focus of a CHINS adjudication is on the condition of the child alone, not on the culpability of one or both parents. *In re N.E.*, 919 N.E.2d 102, 105-06 (Ind. 2010). Nonetheless, "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Rather, a CHINS adjudication under section 31-34-1-1 requires proof of three basic elements: the parent's actions or inactions have seriously endangered the child; the child's need are unmet; and "perhaps most critically," those needs are unlikely to be met unless the State intervenes. *Id.* It is the last element that guards against unwarranted State interference in family life. *Id.* State intrusion is warranted only when parents lack the ability to provide for their children. *Id.* Moreover, when determining whether a child is a CHINS under section 31-34-1-1, and

particularly when determining whether the coercive intervention of the court is necessary, the juvenile court "should consider the family's condition not just when the case was filed, but also when it is heard." *Id.* at 1290.

[14] The petition alleging N.C. was a CHINS made eight factual allegations. Five concerned Mother's conduct, two concerned the fathers of N.C.'s siblings, and one concerned Father, alleging only that he is the noncustodial father of N.C. The only reference to Father in the juvenile court's findings following the fact-finding hearing was to reiterate that Father is the noncustodial father of N.C., despite testimony at the fact-finding hearing establishing Father had temporary custody of N.C. under a court order, DCS had visited the placement and found it appropriate, and there were no allegations of neglect against Father. None of this was mentioned in the juvenile court's order that concluded the "ongoing domestic violence and substance abuse in the family home" necessitated the coercive intervention of the court. Appellant's App., Vol. II at 34.

[15] Although Father had in fact petitioned the Circuit Court for custody of N.C. even before DCS filed its CHINS petition, the evidence supports the conclusion the coercive intervention of the court was necessary early in the CHINS proceedings because Father did not obtain a temporary custody order until two months after the CHINS petition was filed. *See In re D.J.*, 68 N.E.3d 574, 581 (Ind. 2017) (noting the trial court's fact-finding order included findings "that amply support its conclusion that Parents required coercive intervention *early* in the CHINS process). Nonetheless, by the time the fact-finding hearing occurred, Father had obtained a custody order, had custody of N.C. for two

months, and DCS had no concerns about him or about N.C.'s placement with him. The domestic violence and substance abuse referenced by the juvenile court's fact-finding order had occurred in *Mother's* home and N.C. was no longer in that home. In other words, whatever neglect N.C. experienced due to Mother's issues at the outset of this case was rectified by being placed in Father's home by the time of the fact-finding hearing. Neither the trial court's findings nor the evidence in the record support the juvenile court's conclusion that its intervention was required *at the time of the fact-finding hearing* in order to protect N.C.'s health and safety. *See id.* (holding DCS did not prove the *ongoing* coercive intervention of the court was necessary where by the time of the fact-finding hearing, parents had cooperated with DCS and satisfactorily completed all services and met their goals); *In re S.A.*, 15 N.E.3d at 611-12 (holding trial court erred in adjudicating child to be a CHINS because father had resolved the allegations of the CHINS petition by the time of the fact-finding hearing and there was no basis in the record to conclude that if father needed help in the future he would be unlikely to obtain it without the court's intervention).[5]

---

[5] DCS concedes *S.A.* "is substantially similar to the current case[,]" but nonetheless asserts "coercive intervention was still necessary to protect [N.C.] from returning to Mother's care" without meaningfully distinguishing this case from *S.A.* Brief of Appellee at 18. In fact, this case is even more compelling than *S.A.*, in that the concern in *S.A.* was that the father—who was not married to the child's mother and who had been in the military for the first two years of the child's life, including at the time the CHINS petition was filed—had not been involved as a parent (legally, emotionally, or financially) prior to the CHINS proceeding and lacked parenting skills. 15 N.E.3d at 610-12. Neither of those issues are of concern here. And in *S.A.*, despite the evidence regarding the father's non-involvement up to the time of the CHINS petition, our court nonetheless reversed the CHINS adjudication because of the strides the father had made after his discharge and before the fact-finding hearing. *Id.* at 612.

[16]     The State notes Father does not challenge the element that N.C. had a "CHINS condition" and has therefore waived any challenge to this element of a CHINS finding. Brief of Appellee at 11. Citing *Matter of M.R.*, 452 N.E.2d 1085, 1089 (Ind. Ct. App. 1983), DCS contends "once the juvenile court concludes that a parent's actions or omissions have created a CHINS condition (i.e. are detrimental to a child's wellbeing) the court may infer that such actions and condition would continue in the absence of court intervention." Brief of Appellee at 19. That position, however, fails to acknowledge our more recent supreme court precedent clearly treating endangerment—or as DCS phrases it, a "CHINS condition"—and coercive intervention as two separate elements to be proved in a CHINS proceeding. *See In re S.D.*, 2 N.E.3d at 1287. Therefore, even accepting as true that Father has waived consideration of whether N.C. had a CHINS condition, DCS is not relieved of its burden to prove by a preponderance of the evidence that the coercive intervention of the court was required.

[17]     DCS also posits the juvenile court's adjudication of N.C. as a CHINS was appropriate because Father had only a *temporary* custody order and coercive intervention of the court was necessary because "there remained a possibility that [N.C.] could be returned to Mother's care." Brief of Appellee at 20. *In re S.A.* addressed a similar issue: in that case, the child, who had been in the sole care of his mother, was adjudicated a CHINS based on the mother's drug use and placed in the care of his maternal grandmother. The father, who was in the military and had not been involved with the child, subsequently established

paternity and petitioned for a modification of custody. The father requested the juvenile court hear evidence on the custody issue so the child could be released to him if no basis was found for continuing the CHINS, but the juvenile court declined and continued the child's CHINS status due to concerns about the father's fitness. On appeal, this court reversed the CHINS adjudication. 15 N.E.3d at 612. DCS petitioned for rehearing, arguing in part that because the mother had custody of the child and the father had no custody order in his favor, the reversal "effectively sent Child back to a Mother who admitted she needed help with her substance abuse [and] left no room for the CHINS court to protect Child further . . . ." *In re S.A.*, 27 N.E.3d 287, 291 (Ind. Ct. App. 2015) (opinion on reh'g). We disagreed in part because we presumed a hearing would be held on the father's custody petition in due course if it had not already. *Id.* at 292. Here, Father actually *did* have a custody order in his favor at the fact-finding hearing, albeit temporary; nonetheless, N.C. was not going to be returned to Mother's care without Mother first obtaining a court order allowing that. Moreover, when the juvenile court discharged the parties in N.C.'s case at the review hearing—*without objection by DCS*—the exact same custody situation was in place: Father still had only temporary custody of N.C. pursuant to the Circuit Court order. Obviously, neither DCS nor the juvenile court considered this custody arrangement of sufficient concern to continue N.C. as a CHINS at that time, and there is no discernable reason why it should have been treated differently at the fact-finding hearing.

[18]     Based on the foregoing, we conclude DCS failed to prove by a preponderance of the evidence that the coercive intervention of the court was necessary to ensure N.C.'s well-being.[6]

---

[6] Although we need not address this issue given our resolution regarding the fact-finding order, Father also challenges the juvenile court's dispositional order for failing to meet the requirements of Indiana Code section 31-34-19-6 that the disposition be one that least interfere with family autonomy, is least disruptive of family life, and imposes the least restraint on the freedom of parent and child. Specifically, Father contends settling his pending request for modification of custody would have been a preferable alternative to continuing N.C. a CHINS and ordering Father's participation in DCS services. DCS interprets this as a request that the juvenile court should have modified custody in lieu of a CHINS finding. Noting a CHINS fact-finding order is not a final appealable order, DCS argues the juvenile court did not have authority to modify custody unless and until it adjudicated N.C. a CHINS and entered a dispositional order.

First, we note that Father's petition for modification of custody was pending in the Circuit Court, which has concurrent jurisdiction with the juvenile court for the purpose of modifying custody. *See generally* Ind. Code ch. 31-30-1. Had the juvenile court discharged N.C. without first adjudicating him a CHINS, the custody question could have been answered in the Circuit Court with due haste. Instead, the juvenile court's adjudication of N.C. as a CHINS despite no evidence coercive intervention of the court was necessary to ensure N.C.'s care prolonged the resolution of N.C.'s permanent custody, even in the absence of an appeal.

Second, DCS is correct that a long line of cases has declared the dispositional order the final judgment in a CHINS case. *See, e.g.*, *In re J.L.V.*, 667 N.E.2d 186, 188 (Ind. Ct. App. 1996). Father in fact did not file his notice of appeal until after the trial court issued its dispositional order. By the time this case was fully briefed (and we note with appreciation this appeal moved as quickly as an appeal can), the CHINS case was closed, but Father and N.C. had nonetheless been subject to State intervention for nine months. We note, however, that one week after N.C. was discharged by the juvenile court, our supreme court decided the case of *In re D.J.*, 68 N.E.3d 574. In that case, the parties to a CHINS case filed a notice of appeal from an interlocutory fact-finding order and the court of appeals dismissed the appeal for lack of jurisdiction because there was not yet a final order from which to appeal. An earlier supreme court case had declared a *belated* notice of appeal forfeits the right to appeal but does not affect the appellate court's jurisdiction if it chooses to revive that right. *In re Adoption of O.R.*, 16 N.E.3d 965, 971 (Ind. 2014). Akin to that decision, the *D.J.* court held that a *premature* notice of appeal also does not affect the court's jurisdiction. 68 N.E.3d at 578-80. Accordingly, the court decided the merits of the appeal and reversed the trial court's CHINS determination. *Id.* at 581. In general, it is unclear how this discretionary rule of reviewing "premature" appeals will be harmonized with Appellate Rule 14, which sets forth a specific procedure for seeking review of an interlocutory order, or how it will work in practice. Notwithstanding any broader implications of *D.J.* for the courts of this state, however, had Father been able to take advantage of the rule announced in *D.J.* to file his notice of appeal without waiting for the formality of a dispositional order, this appeal could have been resolved even sooner.

# Conclusion

Because DCS failed to prove each element required by statute to show a child is a CHINS, the juvenile court erred in adjudicating N.C.'s a CHINS. We reverse and remand to the juvenile court to vacate the CHINS finding as to N.C.

Reversed and remanded.

Kirsch, J., and Barnes, J., concur.