FILED

May 29 2019, 11:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of E.Y. (Minor Child), | May 29, 2019 |
| and | Court of Appeals Case No. 19A-JC-114 |
| J. M. (Father) | Appeal from the Marion Superior Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Marilyn Moores, Judge |
| | The Honorable Jennifer Hubartt, Magistrate |
| Indiana Department of Child Services, | Trial Court Cause No. 49D09-1808-JC-2146 |
| *Appellee-Petitioner,* | |
| and | |
| Child Advocates, Inc., | |
| *Appellees-Guardian Ad Litem.* | |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, J.M. (Father), appeals the trial court's determination that his minor child, E.Y. (Child), is a Child in Need of Services (CHINS).

We reverse.

# ISSUE

Father presents us with one issue on appeal, which we restate as: Whether the trial court erred when it adjudicated Child to be a CHINS.

# FACTS AND PROCEDURAL HISTORY

A.Y. (Mother) is the mother of Am.M., born on June 5, 2003, S.M., born on October 25, 2008, An.M., born on August 2, 2010, and E.Y., born on August 23, 2013. (collectively, Children). A.M. is the biological father to the three oldest children; while Father is the biological father to E.Y.[1] Mother's relationship with A.M. ended seven years ago and the Children have not been around A.M. since.

The relationship between Mother and A.M. was characterized by domestic violence. A.M. would hit Mother and tie her up, telling Am.M. that he was going to kill her Mother and "she was going to help him bury" her. (Transcript p. 57). After the relationship ended, Mother started seeing a therapist to help

---

[1] Mother and A.M. do not participate in this appeal. This court will include facts with respect to Mother, A.M., and E.Y.'s three older siblings as far as these are relevant to the appeal.

her cope with the psychological effects of the abuse. Approximately two years after A.M. left, Am.M. "started acting out" and Mother took Am.M to a therapist.

[6] Mother entered into a relationship with Father in 2012. At the time of the commencement of the CHINS proceedings, Father and Mother were living together, parenting the Children. Mother and Father are both gainfully employed, have medical insurance for themselves and the Children, and maintain an appropriate home for the family. The Children are bonded with Father and all four call him "Daddy." (Tr. p. 48).

[7] Around March of 2017, Am.M.'s behavior changed. She started to make up "stories and act[ed] out with boys and sometimes she g[o]t[] physical with [Mother]." (Tr. p. 58). She also made two suicide attempts. Mother and Father took Am.M. to see a therapist. When An.M. started school, she began exhibiting behavior issues. As a result, Mother and Father took her to Am.M.'s therapist. The therapist also offered family therapy to Mother, Father, and the Children.

[8] At the beginning of June 2018, Mother and Am.M.'s therapist made a "collaborative decision" to place Am.M. in in-patient care. Consequently, on June 14, 2018, Am.M. was admitted to Columbus Behavioral Health Center (CBHC); she was discharged on October 12, 2018. During her stay at CBHC, Am.M. received therapeutic services by Jana Thompson (Thompson), the lead program therapist. During one of the sessions, Am.M. told Thompson that

"there was a great deal of domestic violence in the home." (Tr. p. 14). She specified that the violence occurred "[m]ostly between her Mother and [Father]. She also reported incidences of violence towards her[self] and the other children." (Tr. p. 16). Pursuant to her statutory obligation, Thompson notified the Indiana Department of Child Services (DCS) about Am.M.'s allegations.

[9] On August 17, 2018, Thompson contacted Mother, informed her that she had alerted DCS, and advised Mother to leave the house and take the Children to a battered women's shelter if she did not want DCS to remove the Children. As a result of Thompson's advice, Mother and the Children spent two nights in a shelter.

[10] At the end of August 2018, Christina Vance (FCM Vance), an assessment family case manager with DCS, performed an assessment of the family due to Thompson's report. Mother told FCM Vance that she had been in relationships with instances of domestic violence before. However, Mother spoke generally and "did not specify that it was with [Father]." (Tr. p. 69). Father expressed his willingness "to do anything to reunite his family" and denied any domestic violence in the home. (Tr. p. 70). He clarified that he is more of a disciplinarian than Mother and admitted to striking S.M., "but he explained it in a capacity to where it was more like a playful punch as versus abuse to sort of toughen [S.M.] up." (Tr. p. 70). Besides noticing S.M. stiffening up and having a "fearful look on his face" when she mentioned Father to him, FCM Vance did not observe anything "concerning or noteworthy" while talking to the Children. (Tr. p. 71). An.M. and S.M. also told FCM Vance that Father

consumes beer every day. At the conclusion of the assessment, DCS recommended the Children to remain with Mother in the residence and for Father to live elsewhere "because the [C]hildren expressed fear and then [DCS] w[as] concerned about domestic issues between [Father] and [Mother]." (Tr. p. 71).

[11] On August 27, 2018, DCS filed its CHINS petition based on the allegations of domestic violence between Father and Mother, which the Child had purportedly witnessed. During the initial hearing, the trial court ordered the Child to remain in Mother's care contingent on Father not residing in the residence. The trial court granted Father supervised visitation with the Child and placed him on a Track Group Monitor, a blood alcohol monitoring device, as well as ordered Father to be assessed for, and participate in, batterer's intervention treatment. Mother was ordered to participate in a domestic violence assessment and follow all recommendations. In addition, the trial court ordered trauma-focused cognitive behavioral therapy for the Children.

[12] On October 26, 2018,[2] the trial court conducted a factfinding hearing at which evidence was presented that Father and Mother had followed all recommendations and Father had not tested positive for alcohol abuse. Thompson testified that she had spoken with Mother on multiple occasions and

---

[2] An initial factfinding hearing was conducted on October 24, 2018, at which A.M., father to Am.M., S.M., and An.M., entered an admission that his three children should be determined CHINS. The trial court accepted the admission and took the adjudication under advisement pending Mother and Father's factfinding.

Mother had told Thompson that she "disagreed with [Am.M.'s] account of what occurred." (Tr. p. 21). Mother clarified that Father "had a temper" and they were "walking on egg shells as to not upset him," but she denied any domestic violence. (Tr. p. 36). As a result of her conversations with Mother, Thompson characterized Mother's report as "emotional domestic violence." (Tr. p. 36). Thompson also described Mother as genuinely concerned about Am.M.'s wellbeing and as a responsible parent who followed DCS's recommendations. Thompson elaborated that she had no concerns about Mother's handling of Am.M.'s medical or mental health.

[13] Mother and Father both testified that they have a good relationship and that there has never been any physical violence between them. They both testified that Father has never physically abused the Children. Mother stated that her concerns about Father's temper were caused by the abuse she had suffered at the hands of A.M. and her resulting PTSD. Mother explained that because of this abuse, she becomes frightened whenever she argues with another person. It is something she is "trying to get through in [her] therapy[.]" (Tr. p. 60). Mother also testified that after DCS became involved, she tried to continue to schedule the Children's individual therapy sessions with the same therapist they had all been seeing during family therapy as the Children were already comfortable with her, but DCS cancelled those appointments and scheduled them with a different therapist.

[14] Father has never been arrested for, or convicted of, any act of violence, nor were any police reports made accusing Father of domestic violence. Father

testified that he was following DCS's recommendations and the court-ordered services "willingly and accordingly." (Tr. p. 43). He confirmed that Am.M. and An.M. were in therapeutic therapy before DCS became involved with the family.

[15] Denisha Thomas, the permanency case manager assigned to the family (PCM Thomas), made monthly home visits with the Children. She confirmed that DCS believes it is necessary for the court to be involved with the family because

> the safety concern would be that there are – that some of the [C]hildren were receiving therapy but not all of the [C]hildren are receiving therapy to address the domestic violence that was alleged and received from the [C]hildren or the statements received from the [C]hildren in regarding witnessing the domestic violence in the home.

(Tr. p. 81). PCM Thomas elaborated that besides the Children's statements, DCS did not investigate whether domestic violence between Mother and Father had actually occurred. She testified that DCS recommended Mother for weekly domestic violence therapy sessions and Father for batterer's intervention services. However, when Father had completed his intake assessment for the batterer's intervention services, the assessor contacted PCM Thomas informing her that "there was not enough information [] to make a recommendation" and "she wanted to address why the referral was submitted." (Tr. pp. 80, 88). Only after PCM Thomas supplied the assessor with further information and "recommended [Father] to re-complete a [Domestic Violence] assessment," did the assessor refer Father to the 26-week batterer's intervention services. (Tr. p.

88). PCM Thomas concurred with Thompson's testimony that Mother is a responsible caregiver for the Children and has been very forthcoming with everyone. She elaborated that DCS's only concern is "that if DCS is not involved will S.M. remain in therapy" but agreed that he is in therapy now, is doing well with it, and "there's no reason to believe that Mother's not going to continue those services." (Tr. p. 86). The Children have expressed to her that—except for E.Y. who was subject to a visitation order—they are upset that they cannot visit with Father and cannot "understand why [Father] is not in the home." (Tr. p. 90).

[16] At the close of the evidence, the trial court took the matter under advisement. On November 26, 2018, the trial court concluded E.Y. to be a CHINS, finding that

> The [C]hildren need a safe and stable home environment as well as counseling, therapy, or other therapeutic intervention to cope with and overcome long term exposure to a volatile home environment, domestic violence, and substance abuse they will not receive or are unlikely to receive without the coercive intervention of the [c]ourt.

(Appellant's App. Vol. II, p. 112). On December 19, 2018, the trial court entered a dispositional order. During the hearing on the order, evidence was presented that Mother had completed the recommendations of the domestic violence assessment, and the homebase case manager recommended to close out the homebased services. Father had completed half of his batterer's intervention services and was "more than happy to complete those." (Tr. p.

108). Evidence was presented that all the Children expressed the desire to spend time with Father and the Children "have generally been in a better mood since they had visits with Father." (Tr. p. 115). At the close of the evidence, the trial court ordered Father to complete the domestic violence therapy and added family therapy, as well as couple's therapy. The trial court continued Father on the alcohol monitoring, but granted Father's request to return to the family home.

[17] Father now timely appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

[18] Father contends that the trial court abused its discretion in finding Child to be a CHINS. In order to adjudicate a child as a CHINS, DCS must prove by a preponderance of the evidence that

> (1) The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) The child needs care, treatment, or rehabilitation that:
>
> (A) The child is not receiving; and
>
> (B) Is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1. In making its determination, the trial court should consider the family's condition not just when the case was filed, but also when it was heard. *In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014). A CHINS adjudication cannot be based solely on conditions that have ceased to exist. *In re S.A.*, 15 N.E.3d 602, 611 (Ind. Ct. App. 2014), *trans. denied*. The adjudication must be based on the evidence presented in court and not on the allegations in the pleadings. *Maybaum v. Putnam Co. O.F.C.*, 723 N.E.2d 951, 954 (Ind. Ct. App. 2000). In reviewing a CHINS determination, we do not reweigh evidence or assess witness credibility. *Matter of N.C.*, 72 N.E.3d 519, 523 (Ind. Ct. App. 2017). We consider only the evidence in favor of the juvenile court's judgment, along with any reasonable inferences arising therefrom. *Id.*

[19] Father maintains that the trial court erred in adjudicating Child a CHINS because there was no evidence E.Y. is in any danger, or that her needs would go unmet in the absence of the coercive intervention of the court. The purpose of a CHINS inquiry is to determine whether a child's circumstances require services that are unlikely to be provided without the intervention of the court, and thus, the focus of a CHINS adjudication is on the condition of the child alone, not on the culpability of one or both parents. *In re N.E.*, 919 N.E.2d 102, 105-06 (Ind. 2010). Nonetheless, "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d at 1287. Rather, a CHINS adjudication under section 31-34-1-1 requires proof of three basic elements: the parent's actions or inactions have seriously endangered the child; the child's

needs are unmet; and "perhaps most critically," those needs are unlikely to be met unless the State intervenes. *Id.* It is the last element that guards against unwarranted State interference in family life. *Id.* State intrusion is warranted only when parents lack the ability to provide for their children. *Id.* In other words, the focus is on the best interests of the child and whether the child needs help that the parent will not be willing or able to provide. *Id.*

[20] Prior to DCS becoming involved with the family, Mother and Father had been proactively addressing certain problems: Mother was seeing a therapist to deal with the consequences of a prior abusive relationship, the family had entered family therapy, and Am.M. and An.M. were enrolled in individual therapeutic sessions. Both parents were gainfully employed, lived in an appropriate residence, and carried insurance which covered the therapy sessions and the Children's medical care. DCS intruded into the family's life when allegations of domestic violence between Father and Mother and between Father and S.M. surfaced during Am.M.'s therapy sessions. Based on these allegations and at DCS's recommendation, the trial court ordered the family to enroll in family therapy sessions and the Children in individual therapy sessions. Mother was required to take domestic violence therapy, and Father was ordered to participate in batterer's intervention treatment and wear a Track Group Monitor to supervise his alcohol abuse.

[21] After the filing of DCS's CHINS petition and prior to the conclusion of the fact-finding hearing, evidence was presented that Mother and Father had followed all recommendations and Father had not tested positive for alcohol abuse.

Father had willfully enrolled in batterer intervention treatment even though Mother and Father denied any domestic violence and Father's initial assessment for the services was inconclusive. By the end of the fact-finding hearing, DCS agreed that all the Children were enrolled in therapy and there was no reason to conclude that Mother would discontinue those services if DCS's involvement with the family ended.

[22] Mindful to consider the family's condition not just when the case was filed, but also when it is heard, we note that resolution of the family's issues had started prior to DCS's involvement. Although DCS's intervention might have enabled a faster resolution, such as Father's participation in batterer's intervention sessions, it is clear that the family had recognized the problems and was working towards a positive outcome. Accordingly, the evidence fails to show that at the time of the fact finding hearing, Father was unwilling to provide the care Child needed without coercive court intervention. When coercion is not necessary, the State may not intrude into a family's life. We therefore reverse the trial court's judgment that Child was a CHINS.

## CONCLUSION

[23] Based on the foregoing, we reverse the trial court's adjudication of Child as a CHINS.

[24] Reversed.

[25] Bailey, J. and Pyle, J. concur