## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 24 2020, 10:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Zachary J. Stock
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

E.P. and C.P. (Minor Children),

And

A.A. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

March 24, 2020

Court of Appeals Case No.
19A-JC-2450

Appeal from the Hendricks
Superior Court

The Honorable Karen M. Love,
Judge

Trial Court Cause No.
32D03-1904-JC-28 &
32D03-1904-JC-29

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, A.A. (Mother), appeals the trial court's Order adjudicating her minor children, E.P. and C.P. (collectively, the Children), to be children in need of services (CHINS).

We affirm.

# ISSUE

Mother presents the court with one issue on appeal, which we restate as: Whether sufficient evidence supported the trial court's determination that its coercive intervention was necessary to protect the Children.

# FACTS AND PROCEDURAL HISTORY

Mother and L.P. (Father)[1] were married in 2005. The couple had two daughters while married, E.P., born October 22, 2005, and C.P., born January 30, 2008. Mother and Father divorced in 2009. They remarried in 2011 but divorced for a second time in 2013. Mother was awarded custody of the Children after each divorce. Father did not pay child support or exercise parenting time between the marriages or after the second divorce. Mother and the Children lived in Brownsburg, Indiana.

---

[1] Father is not a party to this appeal.

[5] The Children developed behavioral issues such as stealing, hoarding food, disrespectful behavior, and physical aggression. In the one and one-half years they were in the Brownsburg school system, E.P. received twenty behavioral reports for possessing items that did not belong to her, acting out, and physical aggression. C.P. had thirteen behavior reports, all of which were for physical aggression.

[6] On February 12, 2018, E.P. admitted that she had obtained the Brownsburg School Corporation's credit card information and used it to make an unauthorized purchase of snacks, an act that would have been fraud if committed by an adult. E.P. was adjudicated to be a delinquent child and was placed in school-based therapy and life skills training. In August 2018, Mother became convinced that E.P. had tried to poison her with a tainted piece of watermelon. The Children later reported that Mother became irate and that Mother had choked and beaten them. After this incident, Mother took E.P. for a brain examination. E.P. violated her probation once by stealing snacks, which caused her probation to be extended to April 7, 2019. E.P. successfully completed her probation, and her therapy and life skills training were discontinued. Mother did not prepare for the discontinuation of E.P.'s services by arranging for her to receive treatment elsewhere.

[7] On April 12, 2019, Officer Elizabeth Danai (Officer Danai) of the Brownsburg Police Department was dispatched to Mother's home on a report that E.P. had run away. Officer Danai had been told to be on the lookout for a female with no shirt on, and, on the way to Mother's home, she spotted E.P., who had no

shirt or shoes on and was clad only in a bra and shorts. When Officer Danai told E.P. that she would be returned to Mother's home, E.P. began to cry uncontrollably. E.P. asked Officer Danai repeatedly not to take her home because she was scared. E.P. reported that Mother had hit her forty to forty-five times with a belt. E.P. had raw patches and severe bruising on her buttocks, a welt on the side of her face, and a cut on her lip.

[8] Mother was arrested and taken into custody. The Department of Child Services (DCS) was alerted, and the Children were placed in kinship care. During an interview with a DCS worker, Mother admitted that she had struck E.P. with a belt and that she had caused the injuries to E.P.'s buttocks. Mother denied that she had caused any other injury to E.P. and claimed that E.P.'s other injuries were self-inflicted.

[9] On April 15, 2019, DCS filed a petition seeking to have the Children declared to be CHINS. DCS alleged neglect, abuse, and that the rebuttable statutory presumption in favor of a CHINS finding would arise based on the April 12, 2019, incident. Also on April 15, 2019, the State filed an Information, charging Mother with Level 6 felony battery on a person less than fourteen years old. On April 25, 2019, after the Children were interviewed and reported Mother's reaction to the August 2018 watermelon incident, the State filed a separate Information, charging Mother with Level 6 felony strangulation, two Counts of Level 6 felony battery on a child less than fourteen years old, and two Counts of Level 6 felony criminal confinement. No-contact orders were issued in both the criminal cases.

[10]   DCS did not initially place the Children with Father because Mother reported that, as a juvenile, Father had sexually abused his sister. DCS investigated Mother's report, including contacting Father's sister, who denied any abuse took place. DCS found Mother's report to be unsubstantiated. Father moved the trial court to have the Children placed with him. On May 15, 2019, and June 19, 2019, the trial court held hearings on Father's motion. Father testified that he had not exercised visitation or paid child support because Mother had not responded to his attempts at contact and had prevented him from seeing the Children. Father also felt that Mother had lied to the Children and told them that Father did not love them or want them in his life. Mother testified that Father was mentally unstable and that he had attempted suicide in 2006. The trial court ordered that the Children would be placed with Father and that Mother, who had been successful at having the no-contact orders lifted in her criminal cases, would exercise therapeutic supervised parenting time.

[11]   On July 16, 2019, the trial court held a fact-finding hearing on DCS' CHINS petition. When asked whether she had beaten E.P. on April 12, 2019, or had ever beaten the Children, Mother invoked her Fifth Amendment right and did not answer. The trial court granted DCS' request to draw a negative inference from Mother's invocation of her right to remain silent. Mother accused Father of domestic violence against her and testified that she felt it was in the Children's best interests not to have Father in their lives. Mother denied that the Children had any abnormal behavioral issues apart from the watermelon incident. Mother had been employed previously as a parenting time supervisor

for DCS and felt that experience would be adequate to effectively navigate the Children's behavior on her own. Mother characterized the April 12, 2019, incident as "isolated," and denied a pattern of abuse against the Children. (Tr. Vol. I, p. 223). Mother felt that DCS and the Children's CASA were misrepresenting the truth to the trial court and that the Children were just telling DCS and the CASA what they wanted to hear.

[12] By the time of the July 16, 2019, fact-finding hearing, Father was experiencing behavioral issues with the Children. Two reports of abuse or neglect had been reported to DCS while the Children were in Father's care, neither of which were substantiated by DCS. Father accused Mother of influencing the Children against him while she exercised parenting time. Father had scheduled an initial appointment for therapy for the Children the day of the hearing at Midtown, which was not the mental health services provider referred by DCS.

[13] According to E.P.'s former probation officer, more could have been done to rehabilitate E.P. after her probation was completed. The Children's DCS permanency family case manager, Lori Urick (FCM Urick), testified that on April 12, 2019, in addition to being hit on the buttocks, E.P. reported that Mother had hit her twice on the head with the belt. After speaking with E.P. and observing her injuries and interviewing Mother, FCM Urick concluded that Mother had caused E.P.'s injuries. Mother had told FCM Urick that Mother had been abused as a child and that she did not feel that she abused the Children. FCM Urick had concerns for the Children's physical safety if they were returned to Mother's care. FCM Urick felt that Mother's and Father's

failure to co-parent had negatively affected the Children, it was important for the Children to have both parents in their lives, and that it was necessary for Mother and Father to find an effective manner in which to co-parent. FCM Urick remarked that there was so much contradictory information involved in the case that it was important for DCS to stay involved with the family and that the Children had ingrained behaviors and underlying issues that needed to be addressed. When asked whether DCS had considered an informal adjustment for the family, FCM Urick confirmed that it had not been considered because the problems confronting the family were "quite deep and large." (Tr. Vol. I, p. 197).

[14] The Children's CASA opined that the Children needed DCS's involvement to address their behavior issues and to deal with the trauma that they had experienced. The CASA felt that the Children required a long-term service plan and that the family required more services than could be addressed by an individual parent. The CASA testified that it was in the Children's best interests to remain involved with the family.

[15] On September 3, 2019, the Children were re-detained by DCS and placed with their previous kinship care because Father had requested that DCS remove the Children from his home due to behavioral issues. On September 5, 2019, the trial court entered its Order declaring the Children to be CHINS. In support of its determination, the trial court entered the following relevant findings and conclusions:

35. The [Children] have suffered trauma from excessive physical discipline, extreme hostility between their parents and abandonment by their father all of which have contributed to the [Children's] behavior issues.

36. [The Children] need therapy and they also need therapeutic parenting with both parents. The [c]ourt finds the coercive intervention of the court is necessary for the [Children] to receive the therapy they need including therapeutic parenting and/or family counseling.

* * * *

39. The evidence from Mother, Father, the school records and observation of FCM Urick . . . all show that [the Children's] behavior is very challenging.

* * * *

44. The parents have not co-parented in five years. Father blames Mother for his poor relationship with the [Children]. Mother doesn't want Father to be involved in the [Children's] lives. These parents will not co-parent without the coercive intervention of DCS and this [c]ourt.

* * * *

49. Mother disclosed to FCM Urick that she was physically abused as a child. Mother denies to FCM Urick that she has "abused" her children. Mother reported to FCM Urick that the [Children] are manipulative.

50. The [C]hildren's behavior issues are extensive and the [c]ourt agrees they need professional help. Psychological evaluations of

[the Children] are needed to determine the scope of services the [C]hildren need.

51. [] FCM Urick does not know who will pay for services at Midtown. It is essential that the [C]hildren receive services without interruption. Therefore, unless DCS can confirm that Medicaid will pay for the services for the [C]hildren at Midtown and that Midtown will cooperate and provide reports to DCS the [C]hildren shall be provided a referral from DCS for all services and shall receive services from a DCS-contracted provider.

* * * *

55. The [c]ourt does not believe [Mother] will do anything to help the [Children] establish a relationship with their Father without the coercive intervention of the [c]ourt.

* * * *

58. [] The [c]ourt finds [the Children] are CHINS because of the cumulative evidence that these girls need professional help to address their behavior issues and their parents need professional help in order to safely supervise these girls.

* * * *

60. [E.P.] exhibits very challenging behavior at [Mother's] home and at school. Mother's physical discipline is very excessive and unless Mother learns alternative appropriate discipline techniques and actually uses them, [E.P.] is at risk in [Mother's] care for additional beatings by [M]other which could cause permanent physical injury to [E.P.] and certain[ly] will seriously endanger and/or impair [E.P.'s] mental and emotional condition.

(Appellant's App. Vol. II, pp. 96-100). The trial court concluded that the Children were in need of care, treatment or rehabilitation that they were not receiving and that they were unlikely to be provided without the coercive intervention of the court.

[16] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Standard of Review*

[17] Mother challenges the evidence supporting the trial court's determination that its coercive intervention was necessary to ensure that the Children received the services they needed. Our standard of review of a trial court's CHINS determination is well-settled: We do not reweigh the evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). We consider only the evidence which supports the trial court's decision and the reasonable inferences to be drawn from that evidence. *Id.* at 1287. In addition, where, as here, the trial court has entered findings of fact and conclusions of law *sua sponte*, for issues that were covered by the trial court's findings, we consider whether the evidence supports those findings and whether the findings support the judgment. *Matter of N.C.*, 72 N.E.3d 519, 523 (Ind. Ct. App. 2017). We do not set aside the trial court's findings or judgment unless they are clearly erroneous, meaning that finding is not supported in the record or that the judgment relies upon an incorrect legal standard. *Id.* Any issues not covered by the trial court's findings are reviewed under a general judgment standard wherein we may

affirm the judgment if it is sustainable on any basis supported by the evidence. *Id*. In addition, DCS was required to prove that the Children were CHINS by a preponderance of the evidence. *See* Ind. Code § 31-34-12-3.

## II. *Coercive Intervention*

DCS sought to have the Children adjudicated CHINS under Indiana Code section 31-34-1-1, which provides as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision . . . and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

DCS additionally alleged that E.P. was a CHINS pursuant to Indiana Code section 31-34-1-2(a), which provides that DCS must prove all the same elements, except that instead of proving neglect, DCS must show that the child's "physical or mental health is seriously endangered due to injury by the act or omission of the child's parent[.]" *See* I.C. § 31-34-1-2(a)(1). DCS further

alleged that the rebuttable statutory presumption in favor of a CHINS finding had arisen. Mother only challenges the trial court's determination that its coercive intervention was necessary.

## A. *E.P. and the Rebuttable Presumption*

[20] DCS alleged that E.P. was a CHINS based on the April 12, 2019, incident. Indiana Code section 31-34-12-4 provides that

> [a] rebuttable presumption is raised that the child is a child in need of services because of an act or omission of the child's parent . . . if the [S]tate introduces competent evidence of probative value that:
>
> > (1) the child has been injured;
> >
> > (2) at the time the child was injured, the parent . . .:
> >
> > > (A) had the care, custody, or control of the child; or
> > >
> > > (B) had legal responsibility for the care, custody, or control of the child;
> >
> > (3) the injury would not ordinarily be sustained except for the act or omission of a parent . . .; and
> >
> > (4) there is a reasonable probability that the injury was not accidental.

Once this showing is made, the rebuttable presumption that a child is a CHINS applies to all the statutory CHINS elements, including the "coercive intervention" element. *See Ind. Dep't of Child Servs. v. J.D.*, 77 N.E.3d 801, 809 n.3 (Ind. Ct. App. 2017), *trans. denied.*

[21] Here, DCS presented evidence that on April 12, 2019, E.P. sustained injuries to her head, lip, and buttocks; Mother had repeatedly struck E.P. with a belt; Mother had legal custody of E.P. and the injury would not have been sustained except for Mother's act of beating E.P. with the belt; and there was a reasonable probability that the injury was not accidental because Mother admitted that she had intentionally struck E.P. The trial court entered findings consistent with this evidence. Therefore, the rebuttable presumption arose that E.P. was a CHINS. *See* I.C. § 31-34-12-4.

[22] In addition, the trial court could have reasonably concluded that Mother failed to rebut this presumption because Mother invoked her Fifth Amendment right when asked if she had beaten E.P. on April 12, 2019, from which the trial court was permitted to draw the negative inference that she had. *See In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014) (holding that "the privilege against self-incrimination does not prohibit the trier of fact in a civil case from drawing adverse inferences from a witness' refusal to testify[.]"). The trial court was not obligated to credit Mother's reports to DCS workers that the injuries to E.P.'s head and face were self-inflicted. Because DCS met its burden on the presumption, which the trial court could have reasonably concluded was not rebutted, the trial court's determination on the "coercive intervention" element as to E.P. was also supported by the evidence. *See J.D.*, 77 N.E.3d at 809 n.3.

B. *Other Evidence Supporting the "Coercive Intervention" Determination*

[23] Even if the rebuttable presumption had not been met or had been rebutted, we would still conclude that sufficient evidence sustained the trial court's "coercive

intervention" determination as to the Children. The aim of a CHINS inquiry is to determine if a child's circumstances require services that are unlikely to be provided absent court intervention. *Matter of E.Y.*, 126 N.E.3d 872, 877 (Ind. Ct. App. 2019). Accordingly, the focus of a CHINS inquiry is on the condition of the child or children, not on the culpability of the parents. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). However, not every endangered child is a CHINS "permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d at 1287. Requiring that DCS prove that the parents lack the ability to provide for the child absent court intervention guards against unwarranted State intrusion in family life. *Id.* The focus is on the best interests of the child and whether the child requires assistance that the parents are not willing or able to provide. *Id.* The CHINS statute does not require that the court wait until a tragedy occurs to intervene; rather, a child is a CHINS when he is endangered by parental action or inaction. *In re C.K.*, 70 N.E.3d 359, 364 (Ind. Ct. App. 2016), *trans. denied*.

[24] Here, Mother and Father displayed an incredible amount of animosity toward each other. For instance, Mother accused Father of molesting his sister, causing the Children to be placed initially with a kinship placement instead of him. That allegation was discredited by DCS' investigation. Mother also stated in open court that Father had traded contact with his daughters for child support. For his part, Father accused Mother of withholding the Children from him, even though he paid no child support or ever moved the court in the divorce proceedings to modify parenting time. Father also accused Mother of

influencing the Children against him. The trial court found that the dysfunctional dynamic between Father and Mother had harmed the Children and that they required professional intervention to address it. Neither Father nor Mother had sought any family therapy prior to DCS involvement, and given Mother's behavior towards Father and her statement at the fact-finding that she felt the Children were better off without Father in their lives, the trial court reasonably concluded that its coercive intervention was necessary to procure the family therapy the Children required so that their parents could learn to effectively co-parent.

[25] Mother's attempts to downplay the seriousness of the Children's behavioral issues and her reaction to their behavior further supported the trial court's determination. Despite E.P.'s twenty school write-ups, E.P.'s true-finding for fraud, and C.P.'s thirteen school write-ups, all of which were for aggressive behavior, Mother testified that the Children had no abnormal behavioral issues apart from the watermelon incident. There is no evidence that Mother had arranged or was planning to arrange for E.P. to continue receiving therapy after her fraud probation services ended. Rather, Mother felt that her experience as a DCS parenting time supervisor qualified her to handle the Children's serious behavioral issues. Mother told a DCS worker that the injuries on E.P.'s head and lip were self-inflicted. Mother denied to FCM Urick that she abused the Children.

[26] The trial court found that Mother's discipline of the Children was excessive, and that she needed professional assistance to reform her methods of discipline

so that a tragedy would not occur. Given that Mother denied that the Children had abnormal behavior issues or that she had abused them, going so far as to claim that some of E.P.'s injuries were self-inflicted, the trial court reasonably concluded that Mother was unlikely to seek assistance for her excessive disciplinary methods without its intervention.

[27] Mother argues that the trial court's coercive intervention was unnecessary because she expressed a willingness to do whatever it took to reunify her family. However, the trial court was not obligated to give overriding weight to that testimony, and it did not. *See In re S.D.*, 2 N.E.3d at 1286 (holding that we do not reweigh the evidence or rejudge witness credibility on appeal). This was reasonable in light of Mother's denials that there were any issues to address, either with the Children's behavior or her methods of discipline.

[28] Mother also likens her case to *Matter of E.K.*, 83 N.E.3d 1256 (Ind. Ct. App. 2017), *trans. denied*. After three-year-old E.K. threw a temper tantrum, his father spanked him three times, twice over E.K.'s diaper and once on E.K.'s bare bottom. *Id.* at 1259. This discipline left bruises on E.K.'s buttocks which were noticed the next day by his daycare provider, who reported it to DCS. E.K. was not removed from his parents' care following this incident. *Id.* E.K.'s father and mother fully cooperated with DCS, complied with a voluntary safety plan not to use physical discipline on E.K., and participated in home-based family counseling. *Id.* The father also completed psychological testing and followed its treatment recommendations. *Id.* Nevertheless, the trial court granted DCS' request that E.K. be declared a CHINS, finding that its coercive

intervention was necessary to protect E.K. *Id.* at 1260. This court reversed, concluding that there was no evidence that the father had any history of excessive discipline, he had not used physical discipline on E.K. after DCS' intervention, both parents had cooperated with DCS fully, and DCS had never felt it necessary to remove E.K. from the home. *Id.* at 1261-62. The court observed that "[o]ne lapse of judgment by [the f]ather is not enough to warrant a CHINS finding for E.K., where the parents had been fully cooperative in addressing that lapse." *Id.* at 1262-63. The court also noted that it was unclear whether the parties had ever discussed the possibility of an informal adjustment, which could have been an alternative to a CHINS proceeding. *Id.* at 1263.

[29] Based on *E.K.*, Mother argues that her conduct was nothing more than "an isolated lapse in judgment" and that DCS should have attempted to pursue an informal adjustment. (Appellant's Br. p. 9). We find this argument to be unavailing. The officer who intercepted E.P. on April 12, 2019, testified without objection that E.P. reported that Mother's discipline that had resulted in E.P.'s visible wounds was "normal practice" and that "this has happened previously." (Tr. Vol. I, p. 103). Father testified that he had to intervene between Mother and the Children in the past because Mother was hitting them too hard or too much. Therefore, there was evidence in the record that Mother's excessive discipline was not just a one-time lapse in judgment. In addition, the trial court's determination was also based on the animosity between the parents, which was long-standing and apparent even during the fact-finding hearings.

[30] We also find Mother's call for an informal adjustment to be unpersuasive. The record is bereft of any formal request by Mother to DCS or argument to the trial court in favor of an informal adjustment. The trial court cannot be said to have erred by failing to provide an outcome that was never requested or argued. However, Mother did ask FCM Urick at the fact-finding hearing whether DCS had considered an informal adjustment, and her response was that it had not because the issues involved were "quite deep and large." (Tr. Vol. I, p. 197). We find this conclusion to be supported by the record, because unlike *E.K.*, Mother's conduct was not isolated, the April 12, 2019, incident was serious enough that the Children were removed from her care, and Mother had not begun family therapy and had only just begun her supervised, therapeutic parenting time with the Children. Therefore, she had not demonstrated any long-term ability to follow up on her stated willingness to comply with DCS directives. In short, we conclude that there is no evidence in the record that an informal adjustment was a necessary prelude to filing a CHINS petition in this case.

## CONCLUSION

[31] Based on the foregoing, we conclude that the trial court's determination that its coercive intervention was necessary to protect the Children was supported by sufficient evidence in the record.

[32] Affirmed.

[33] Baker, J. and Brown, J. concur