## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 23 2020, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Indianapolis, Indiana

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

Dede K. Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of A.W.:

E.Y.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

July 23, 2020

Court of Appeals Case No.
20A-JC-21

Appeal from the Marion Superior Court

The Honorable Mark Jones, Judge

The Honorable Diana Burleson, Magistrate

Trial Court Cause No.
49D15-1904-JC-924



*Appellee-Guardian ad Litem.*

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, E.Y. (Mother), appeals the trial court's adjudication of her minor child, A.W. (Child), as a Child in Need of Services (CHINS).

We affirm.

# ISSUE

Mother presents this court with one issue on appeal, which we restate as follows:  Whether the trial court erred by adjudicating Child to be a CHINS.

## FACTS AND PROCEDURAL HISTORY

[4] Mother is the biological parent to Child, born on January 14, 2019.[1] B.W. (Father) is the Child's biological father.[2] Mother had been in a relationship with Father for about nine months prior to DCS's involvement. In March and April 2019, DCS became involved with the family due to the parents' domestic violence in the presence of Child, and Father's untreated mental health issues. Mother told DCS's family case manager (FCM) that Father busted through a locked door, put his hands on her, and slapped her "in front of the children." (Transcript p. 65). On April 4, 2019, DCS filed a CHINS petition, alleging that "Mother and Father [] have an extensive history of domestic violence in the [Child's] presence, and they were recently involved in a physical altercation." (Appellant's App. Vol. II, p. 25). "Mother reported Father [] is diagnosed with bipolar disorder and is not taking his medication as prescribed. Since May 2018, there have been multiple police runs to the family's home due to domestic violence disputes between Father [] and Mother. Additionally, on March 17, 2019, Father was detained by law enforcement and taken to St. Vincent's Stress Center due to his untreated mental health issues." (Appellant's App. Vol. II, p. 25). After the hearing, the trial court ordered Child removed from the Parents' care and placed with Mother on a trial home visit, contingent upon (1)

---

[1] Mother is also the biological parent to C.S., born on November 8, 2017. Although C.S. was initially detained by DCS and adjudicated a CHINS, his case was closed and he was placed with his biological father, who is not Child's biological father.

[2] Father does not participate in this appeal.

Mother's participation in domestic violence and home-based therapy services and (2) Mother obtaining a protective order against Father.

[5] By May 17, 2019, Father was incarcerated in Marion County jail "[b]ecause of breaking and entering—residential breaking and entering and domestic violence in front of the [Child]" and "strangulation," resulting from an incident on May 12, 2019 where Mother was the victim. (Tr. pp. 6-7). At the time, Mother and Child were living with maternal grandmother when Father "broke into [the] house" and "things went bad." (Tr. p. 19). Once inside, Father "choked her and strangled her" with the Child present. (Tr. p. 65). As a result, a no-contact order was put in place through the criminal cause and DCS amended its CHINS petition to include the May 12, 2019 incident.

[6] On July 11, 2019, FCM was informed by Mother that Father had come to the house the night before to see the Child, but "she did not let him in." (Tr. p. 42). However, while Mother was outside, Father returned to the house and entered. Mother gathered the Child into her car and called the police. The following day, July 12, 2019, Mother contacted the FCM and requested a "pack n play," which the FCM delivered to her house. (Tr. p. 42). When the FCM knocked on the door, a male answered and informed the FCM that he was Mother's brother. Mother later confirmed that the man was her brother and "was watching the [Child] for her" while she went to the store. (Tr. p. 43). On July 17, 2019, the FCM returned to Mother's residence to inform her of the results of her drug screen. As the FCM walked up to the home, he noticed the same man that the FCM had encountered five days earlier. The man left the home

briefly, but then went back inside. When Mother exited the house, the FCM inquired about the male but Mother denied that a man was in the house. The FCM later discovered that the man at Mother's residence was Father.

[7] On July 19, 2019, DCS filed an emergency motion to remove Child from Mother's care based on the events between July 11 and 17, 2019, and Mother's positive methamphetamine screen. The trial court conducted a hearing the same day, at the close of which the court ordered the Child removed and placed in foster care. The trial court also instructed Mother to participate in random drug screens and supervised visitation.

[8] On July 25, 2019, the trial court held a fact-finding hearing at which Mother denied that there had been any domestic violence incidents with Father prior to DCS's involvement. Although Mother had not participated in domestic violence services or therapy, she had completed a survivor counseling assessment with Jordan Fonseca (Fonseca), a counselor at Families First. During the assessment, Mother informed Fonseca that she had been diagnosed with ADHD and anxiety "a few years ago" and that she was not prescribed any medication. (Tr. p. 32). When questioned as to why Mother was involved with DCS, Mother's response was "pretty vague." (Tr. p. 30). She advised that "the reason DCS got involved was because her partner at the time was outside throwing rocks on the ground and the police were called and the next thing she knew the next day or something like that, she had a note on her door stating that they would like to speak to her regarding the [Child's] safety." (Tr. p. 30). While Mother alluded that there were allegations of domestic violence, Fonseca

clarified that Mother "never told [him] that there was actually domestic violence in the relationship." (Tr. p. 30). Mother also questioned "why she was needing to have a survivor counseling assessment." (Tr. p. 30). When describing her relationship with Father, Mother told Fonseca that Father has

> bi-polar disorder and other mental health issues and he was not taking his medication so they had one bad day where he was kind of, you know, acting out and angry and things like that, but she never admitted to any physical abuse or any abuse that he did towards her or the children. It was more so that he was angry and outside throwing rocks and the neighbors thought that he was breaking into the house. So that's why DCS got involved, but she denied any sort of domestic violence.

(Tr. pp. 31-32). When asked what she meant by a "bad day," Mother explained that "he was angry for some reason and he needed to go outside and cool down." (Tr. p. 32). Fonseca did not consider Mother to be "one hundred percent truthful." (Tr. p. 36). Upon the completion of the assessment, Fonseca recommended that Mother participate in a sixteen-week survivor group therapy program. However, Mother was hesitant to commit to the weekly group sessions due to childcare barriers and transportation issues. Fonseca discharged Mother when she failed to contact him to commence services.

[9] Paula Pettis-Garret (Garret), a licensed clinical social worker at Family Community Partners, became involved with Mother on April 18, 2019 through a DCS referral. Garret became concerned after the incident of domestic violence between Mother and Father on May 12, 2019. Mother told Garret that Father "bust[ed] in" the door and entered "without permission." (Tr. 53).

She told Garret that Father "choked her" but she "didn't go into detail what kind of hitting." (Tr. p. 53). Despite working with Mother ten or eleven times, Garret did not "feel like [Mother] is quite catching that—what domestic violence looks like just all together." (Tr. p. 58). She was concerned that they were "still at ground zero" and Mother was making excuses for Father. (Tr. p. 59). Garret recommended against closing the case "[b]ecause there's been no progress and we're still having the issues with [Father]." (Tr. p. 61).

[10] Mother requested that the Child be allowed to reside with Mother in Paternal Grandmother's home. Paternal Grandmother, a DCS family case manager, testified that she had not seen her son "for a couple of months" and he did not know where she lived. (Tr. p. 79). She claimed that Father had robbed her before and is "unmedicated and unstable." (Tr. p. 80). She described her home as having security cameras and being a safe place

[11] At the conclusion of the fact-finding hearing, the trial court took the matter under advisement. Meanwhile, and prior to the trial court's decision, Mother started participating in services in September, but the provider believed that Mother just "wanted to go through the motions in order to get the [Child] back" and struggled to "grasp the concept of the seriousness of" domestic violence. (Tr. pp. 87-88). Mother had not visited the Child since September 23, 2019, apparently due to changes in visitation providers as well as Mother's hope that Child would be returned to her care.

[12] On October 24, 2019, after taking the matter under advisement, the trial court adjudicated Child as a CHINS. On November 14, 2019, DCS filed its petition for parental participation and its predispositional report.

[13] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

[14] Mother contends that the trial court abused its discretion in finding Child to be a CHINS. In order to adjudicate a child as a CHINS, DCS must prove by a preponderance of the evidence that:

> (1) The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
> > (A) When the parent, guardian, or custodian is financially able to do so; or
> >
> > (B) Due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) The child needs care, treatment or rehabilitation that:
>
> > (A) The child is not receiving; and
> >
> > (B) Is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1 (2019). In making its determination, the trial court should consider the family's condition not just when the case was filed, but also when it was heard. *In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014). A CHINS adjudication cannot be based solely on conditions that have ceased to exist. *In re S.A.*, 15 N.E.3d 602, 611 (Ind. Ct. App. 2014), *trans. denied*. The adjudication must be based on the evidence presented in court and not on the allegations in the pleadings. *Maybaum v. Putnam Co. O.F.C.,* 723 N.E.2d 951, 954 (Ind. Ct. App. 2000). In reviewing a CHINS determination, we do not reweigh evidence or assess witness credibility. *Matter of N.C.*, 72 N.E.3d 519, 523 (Ind. Ct. App. 2017). We consider only the evidence in favor of the trial court's judgment, along with any reasonable inferences arising therefrom. *Id*.

[15] Mother maintains that the trial court erred in adjudicating Child to be a CHINS because there was no evidence Child was in any danger, or that his needs would go unmet in the absence of the coercive intervention by the trial court. The purpose of a CHINS inquiry is to determine whether a child's circumstances require services that are unlikely to be provided without the intervention of the court, and thus, the focus of a CHINS adjudication is on the condition of the child alone, not on the culpability of one or both parents. *In re N.E.*, 919 N.E.2d 102, 105-06 (Ind. 2010). Nonetheless, "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.,* 2 N.E.3d at 1287. Rather, a CHINS adjudication under Indiana code section 31-34-1-1 requires proof of three basic elements: the parent's actions or inactions

have seriously endangered the child; the child's needs are unmet; and "perhaps most critically," those needs are unlikely to be met unless the State intervenes. *Id*. It is the last element that guards against unwarranted State interference in family life. *Id*. State intrusion is warranted only when parents lack the ability to provide for their children. *Id*. In other words, the focus is on the best interests of the child and whether the child needs help that the parent will not be willing or able to provide. *Id*. Despite a "certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that—a determination that a child is in need of services." *In re N.E.* 919 N.E.2d at 105.

[16] Although we agree with Mother that she has made some positive changes by starting services, we are concerned that Mother continues to deny the reality of the domestic violence that exists in her relationship with Father, which led to the Child's detention in the first place. At the time of the fact-finding hearing, Mother refused to admit that a domestic violence issue existed, despite the prior history. Besides the domestic violence incident that led to DCS's involvement with the family, Mother and Father incurred three more incidents in the timespan of barely a year. Furthermore, despite a protective order, Mother allowed Father in the house, representing him as her brother when DCS inquired about his presence.

[17] Even though evidence reflects that Mother participated in some domestic violence and counseling services, Mother failed to grasp the importance of domestic violence, instead minimalizing it and making excuses for Father.

Although having met ten to eleven times with Garrett, Mother is still at the beginning stage of the domestic violence education. Mother's permission to allow Father in the house in July 2019 directly led to the Child's removal from the trial home visit. As we have frequently recognized, a Child's exposure to domestic violence can support a CHINS finding. *In re N.E.,* 919 N.E.2d at 105.

[18] Mother argues that an informal adjustment would be a more preferable option than a CHINS adjudication, especially in light of her recent participation in services. However, the record indicates that DCS and Mother attempted, through mediation, to use an informal adjustment, but as recognized by Mother, it was withdrawn and discharged at the July 25, 2019 fact-finding hearing. Afterwards, Mother never argued that the trial court erred by dismissing the Informal Adjustment.

[19] Recognizing that a CHINS determination is not a finding of guilt for either parent, but rather a vehicle to ensure the safety of the child, we conclude that Mother's actions have seriously endangered the Child and without coercive intervention of the court, the Child will not receive the safety and care he needs. Mother denied the instances of domestic violence in the house, and downplayed the seriousness of the situation, making excuses for Father's behavior. The Child needs a home environment that is stable and free of domestic violence and substance abuse. The coercive intervention of the court is required to accomplish this goal as Mother denied domestic violence was present in the home and rejected the need for survivor counseling.

Accordingly, the trial court did not abuse its discretion by adjudicating Child to be a CHINS.

# CONCLUSION

[20] Based on the foregoing, we hold that the trial court properly adjudicated Child to be a CHINS.

[21] Affirmed.

May, J. and Altice, J. concur